IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

_____

No. 17-0496

_____

*In re* K.E. & K.E.

FILED

**February 20, 2018**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

Appeal from the Circuit Court of McDowell County
The Honorable Booker T. Stephens, Judge
Civil Action Nos. 16-JA-035, 036

REVERSED AND REMANDED WITH DIRECTIONS

_____

Submitted: January 23, 2018
Filed: February 20, 2018

William O. Huffman, Esq.
Law Office of William O. Huffman
Princeton, West Virginia
Counsel for the Petitioners
C.G. and K.G.

Patrick Morrisey, Esq.
Attorney General
S. L. Evans, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for the Respondent
Department of Health and Human
Resources

Philip A. LaCaria, Esq.
Law Office of Philip A. LaCaria
Welch, West Virginia
Guardian ad Litem to K.E. and K.E.

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syllabus Point 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2. "West Virginia Code § 49-3-1(a) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety

i

establishes that such placement is not in the best interests of the child." Syllabus Point 4, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

3. "By specifying in West Virginia Code § 49-3-1(a)(3) that the home study must show that the grandparents 'would be suitable adoptive parents,' the Legislature has implicitly included the requirement for an analysis by the Department of Health and Human Resources and circuit courts of the best interests of the child, given all circumstances of the case." Syllabus Point 5, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

WALKER, Justice:

Twins K.E. and K.E.[1] were born dependent on drugs in April 2016. The West Virginia Department of Health and Human Resources (DHHR) immediately placed the Twins in foster care. Later, the Circuit Court of McDowell County terminated the parental rights of their biological parents, and both their foster parents and their paternal grandparents sought to provide the Twins with a permanent home. Relying on the "grandparent preference" contained in West Virginia Code § 49-4-114(a)(3) (2015), the circuit court selected the grandparents for permanent placement.

At issue here is whether the circuit court correctly applied the grandparent preference in permanently placing the Twins. On the particular circumstances of the Twins' case, and in light of our prior guidance regarding the application of that preference, we conclude that it did not. Accordingly, we reverse the circuit court's order awarding permanent placement of the Twins to their paternal grandparents and remand this matter to the circuit court for entry of an order requiring DHHR to gradually transition K.E. and K.E. to the custody of C.G. and K.G., their foster parents.

---

[1] We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See In the Matter of Scottie D.,* 185 W.Va. 191, 192 n.1, 406 S.E.2d 214, 215 n.1 (1991).

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Twins were born in April 2016 at Welch Community Hospital in McDowell County. Their mother, R.E., tested positive for cocaine, benzodiazepines, and Suboxone at their birth. Following delivery, the Twins tested positive for cocaine and showed signs of withdrawal. They were immediately transferred from Welch Community Hospital to Carilion Roanoke Memorial Hospital in Roanoke, Virginia (Roanoke Memorial), for treatment of their withdrawal symptoms. They remained at Roanoke Memorial for the first few weeks of their lives. R.E. did not accompany them from Welch, West Virginia, to Roanoke, Virginia, approximately 140 miles away.

DHHR immediately took protective custody of the Twins. DHHR did not consider granting protective custody of the Twins to a member of R.E.'s family because she had previously told DHHR that they were not "appropriate." Instead, DHHR placed the Twins with foster parents C.G. and K.G., who also cared for the Twins' older, half-brother T.N.[2] C.G. and K.G. reside in Mercer County, West Virginia, where they work and care for seven (7) other children. Yet, either C.G. or K.G. remained with the Twins at Roanoke Memorial through the Twins' hospitalization. No member of the Twins' biological family visited them at Roanoke Memorial or asked DHHR to do so.

---

[2] C.G. and K.G. adopted T.N. in November 2016. R.E. is the biological mother of both T.N. and the Twins.

DHHR did not know the identity of the Twins' biological father when they were born in April 2016. In May 2016, however, R.E.'s long-time boyfriend, E.N., told DHHR that he was "most likely" the Twins' father. This could not be confirmed by DNA testing, though, until September 2016 due to E.N.'s lack of cooperation. According to DHHR reports, no biological relatives of the Twins—including E.N.'s parents—had expressed interest in giving the Twins a home as of November 2016. The Twins' biological parents, E.N. and R.E., stopped attending proceedings in the Twins' abuse and neglect case after May 2016, and they made no efforts to enter drug rehabilitation as directed by DHHR. Concluding that the biological parents' actions "borderline[d] on abandonment," the circuit court terminated their parental rights in December 2016. Meanwhile, the Twins remained in C.G. and K.G's care. As of November 2016, C.G. and K.G had retained counsel and gained intervenor status in the Twins' abuse and neglect case.

In late December 2016 or early January 2017, E.N.'s mother, M.D. (the Twins' paternal grandmother), contacted Child Protective Services Worker Amanda Starling (Starling) seeking permanent custody of the Twins. M.D. and Starling were already acquainted. They had met because M.D. and her husband, D.D. (the Grandparents), served as guardians to another daughter of E.N.—the Twins' half-sister. Starling followed up on M.D.'s call with a home visit. She then referred the case to DHHR's adoption unit, where it was assigned to Lydia Lambert (Lambert), Region IV Adoption Specialist, in approximately January 2017.

The circuit court held a review hearing on March 23, 2017 to address the Twins' permanent placement.[3] During the hearing, the Twins' guardian ad litem recommended that the Twins remain with the foster parents, C.G. and K.G. Lambert, speaking on behalf of DHHR, recommended that the Twins be permanently placed with the Grandparents because they were an approved foster home and they were guardians to the Twins' half-sister. Lambert also stated that M.D. had told DHHR employee Marsha Phillips (Phillips) that she was interested in caring for the Twins if they were, in fact, her son's children, as early as August 2016.

The circuit court then questioned M.D., who confirmed that she had expressed interest in the Twins to Phillips in August 2016. She further represented that she had told the Twins' foster mother that she wanted to care for the Twins if they proved to be her biological grandchildren. M.D. also stated that she called Starling "500 times" about the matter before late December 2016 or early January 2017. In response to questioning by the court, Starling flatly denied that M.D. contacted her before late December 2016 or early January 2017.

---

[3] Counsel for DHHR, R.E., and E.N. appeared at the hearing, as did Starling and Lambert. C.G. and K.G. appeared by counsel and in person. Although M.D. was not a party to the Twins' abuse and neglect proceeding, the circuit court invited M.D. to participate in the hearing after learning that she was waiting in the courtroom hallway. The circuit court also noted on the record during the March 2017 hearing that M.D. had submitted a letter. That letter was not included in the Appendix Record.

4

During the March 2017 hearing, it became apparent that the Twins' biological parents, R.E. and E.N., remained a part of the Grandparents' lives. Starling testified that, in September 2016, she notified R.E. and E.N. of the Twins' paternity by calling the only contact telephone number they had given her—the Grandparents' home. Upon calling that telephone number, Starling spoke directly to R.E., who then shared the test results with E.N., who was also present in the home at the time. Starling also testified that E.N. entered the Grandparents' home while she conducted the home visit in late 2016 or early 2017. Finally, Starling testified that R.E. and E.N. live a few doors down from the Grandparents, in a house owned by the Grandparents. According to Starling, when parental rights are terminated due to drug use and the biological parent has not attempted rehabilitation, "there is no contact to be made between the terminated parents and the children."

Approximately one month later, on April 26, 2017, the circuit court ruled that the Twins should be permanently placed with their Grandparents. The circuit court explained,

> This goes against the recommendation of the guardian ad litem, but I feel that since these children are so young that—that they will not be affected. If they were much older, I think we—we would have a—would have a different outlook and a different result, but they're one-year-old children or no more than two. They're still babies. Also, I defer to blood relatives, I'll just tell you, whenever that's possible. Plus, the grandparents have a—is it a [*sic.*] half-sister? . . . That you already have of [the Twins]. So that will be the Court's ruling. . . . —in the best interest of these children that they be returned to the grandparents.

The circuit court memorialized its bench ruling by Order entered on May 1, 2017. C.G. and K.G. now appeal that order.

## II. STANDARD OF REVIEW

We previously have explained the dual standard we apply when reviewing abuse and neglect cases such as this:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[4]

With this standard at the fore, we consider the sole issue raised on appeal: whether the circuit court in this case correctly applied the grandparent preference found in West Virginia Code § 49-4-114(a)(3) in light of this Court's prior guidance.

---

[4] Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

## III. ANALYSIS

On appeal, C.G. and K.G. argue that a permanent placement with the Grandparents is not in the Twins' best interest. They acknowledge the effect of the grandparent preference, but contend that the circuit court failed to account for pertinent record evidence that must be considered in conjunction with that preference, namely that (a) the Twins' biological parents—whose parental rights have been terminated—have free access to the Grandparents' home and live but two doors down the street in a home owned by the Grandparents; and (b) the Grandparents likely knew as early as May 2016 that the Twins were their grandchildren, yet took minimal steps to visit them or to obtain custody until December 2016. The Twins' guardian ad litem filed a brief in which he echoes C.G. and K.G.'s arguments. Conversely, DHHR contends that the circuit court did not abuse its discretion by placing the Twins with their Grandparents because C.G. and K.G. failed to overcome the grandparent preference before the circuit court. We will examine the grandparent preference, then each of C.G. and K.G.'s arguments, in turn.

The grandparent preference at issue in this case appears in West Virginia Code § 49-4-114(a)(3). That subsection states:

> For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it

7

shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.[5]

As we have previously explained, "[t]he Legislature adopted the so-called 'grandparent preference' to govern the adoption of children whose parents' parental rights have been terminated through abuse and neglect proceedings."[6]

The preference is just that—a preference. It is not absolute. As this Court has emphasized, the child's best interest remains paramount:

> West Virginia Code § 49-3-1(a) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child.
>
> By specifying in West Virginia Code § 49-3-1(a) that the home study must show that the grandparents "would be suitable adoptive parents," the Legislature has implicitly included the

---

[5] In 2015, the West Virginia Legislature recodified Chapter 49 of the West Virginia Code relating to Child Welfare. The grandparent preference, which was originally set forth in West Virginia Code § 49-3-1(a), is now codified at § 49-4-114(a)(3). The statutory text relevant to the grandparent preference was not changed.

[6] *In re Elizabeth F.*, 225 W. Va. 780, 786, 696 S.E.2d 296, 302 (2010).

requirement for an analysis by the Department of Health and Human Resources and circuit courts of the best interests of the child, given all circumstances of the case.[7]

In short, "[t]he grandparent preference must be considered in conjunction with [this Court's] long standing jurisprudence that 'the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children.'"[8]

In this case, while the circuit court couched its permanency decision in terms of the Twins' best interests, it made plain during the March 2017 review hearing that its decision rested in large part on its avowed deference to "blood relatives."[9] The circuit court's deference veers impermissibly close to the erroneous belief that "the grandparent preference [is an] absolute directive to place children with their grandparents in all circumstances."[10] That belief, by itself, is clear legal error given this Court's earlier

---

[7] Syl. Pts. 4 and 5, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

[8] *In re Hunter H.*, 227 W. Va. 699, 703, 715 S.E.2d 397, 401 (2011) (quoting Syl. Pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996)).

[9] We have previously observed that West Virginia law does not grant a permanency preference to blood relatives, generally. *See Kristopher O. v. Mazzone*, 227 W. Va. 184, 193, 706 S.E.2d 381, 390 (2011). The grandparent preference is the sole exception to that rule, and, even then, the preference is tempered by consideration of the child's best interests. *Id.*

[10] *In re Elizabeth F.*, 225 W. Va. at 786, 696 S.E.2d at 302.

guidance that the preference must be considered in conjunction with the health and welfare of the child.[11]

Setting aside the circuit court's erroneous conception of the statutory grandparent preference, our review of the entire record in this case leaves the Court with the firm conviction that the circuit court mistakenly concluded that the Twins' best interests are served by permanently placing them with their Grandparents. First, as recounted above, CPS Worker Starling testified that the Twins' biological parents live in a house owned by the Grandparents, and which is located two doors down from the Grandparents' own home. Starling's testimony is unrebutted. Not only do the Twins' biological parents live within eyeshot of the Grandparents, they also appear to use the Grandparents' home as their own. They receive official telephone calls there. E.N., the Twins' biological father, enters the Grandparents' home unannounced. The Twins' biological parents' proximity and access to the Grandparents' home renders their permanent placement there untenable.

This Court has reversed a circuit court's decision to place minor children with their grandparents in similar circumstances to ensure that the children's best interests

---

[11] *In re Hunter H.*, 227 W. Va. at 703, 715 S.E.2d at 401.

10

are served.[12]  In *In re Elizabeth F.*, this Court reversed the circuit court's grant of custody of four minor children to their maternal grandmother, despite the grandparent preference. There, the record revealed that the grandmother had refused to shield the minor children from the "negative influences" of her adult children.[13]  Specifically, the grandmother permitted the children's mother "to live in her home while [the mother] was using and abusing drugs", and the children's uncle to live in a trailer behind the grandmother's house despite his numerous CPS referrals.[14]

Similarly, in *In re T.R.*, this Court refused to place a child with his maternal grandparents where the record showed that the grandparents resided in the same "family compound" as the child's mother, whose parental rights to T.R. were previously terminated.[15]  This Court explained,

> Following our review of the record on appeal, we find no factual basis for petitioner's claim that the DHHR failed to consider the grandparents as a potential relative placement.  It is clear from the record on appeal that a DHHR case worker visited the grandparents' home and that the DHHR knew that the grandparents and petitioner were a close family who lived

---

[12] *See In re Elizabeth F.*, 225 W. Va. at 785–87, 696 S.E.2d at 301–03; *see also In re T.R.*, App. No. 15-1235, 2016 WL 3165801, at *3 (W. Va. June 6, 2016) (memorandum decision).

[13] *Id.*, 225 W. Va. at 785, 696 S.E.2d at 301.

[14] *Id.*

[15] *In re T.R.*, 2016 WL 3165801 at *2.

11

in close proximity to one another.  According to the DHHR, the grandparents were considered for placement in the beginning of the case and ultimately found to be unsuitable.[16]

Despite hearing Child Protective Services Worker Starling's testimony on this topic, the circuit court not only granted permanency to the Grandparents, but did so with no direction to the Grandparents as to the importance of shielding the Twins from R.E. and E.N.  According to the unrebutted evidence before the circuit court, when parental rights are terminated due to drug use, and the biological parent has not attempted rehabilitation, as is the case here, "there is no contact to be made between the terminated parents and the children."  While DHHR represented at oral argument that it has verbally instructed the Grandparents not to permit R.E. and E.N. to access the Twins, it also admitted that there is nothing in writing to that effect.  Even if there were, R.E. and E.N.'s undisputed physical proximity to the Grandparents' home would make that instruction impossible to follow.

Moreover, the circuit court gave little consideration to the bond developed by the Twins with C.G. and K.G., their foster parents, and T.N., their half-brother, during the Twins' first seventeen months of life.  C.G. and K.G. solely cared for the Twins from their birth in April 2016 to approximately April 26, 2017, the date the circuit court awarded permanent placement to the Grandparents.  From that date until June 9, 2017, the Twins

---

[16] *Id.* at *3.

were gradually transitioned to the Grandparents' home. Thus, C.G. and K.G. were part of the Twins' lives from April 2016 until June 2017. Also, C.G. and K.G.—not the Grandparents—saw the Twins through their hospital stay.

This Court has previously stressed the importance of the "continuity of relationships, surroundings and environmental influence" during a child's first three years of life.[17] These early years are truly formative because, "[i]n their simple everyday activities, infants and toddlers form the foundations of *all* later development."[18] Thus, the Twins' best interests require that the bonds they formed with C.G. and K.G. in their first seventeen months of life not be short-changed.

In contrast, the Grandparents had never met the Twins as of April 26, 2017, when the circuit court ordered that the Twins should be permanently placed with them. DHHR contends that the Grandparents delayed asserting their claim to the Twins until DNA testing confirmed that the Twins were, in fact, their son's children.[19] E.N., however,

---

[17] *See In Interest of Carlita B.*, 185 W. Va. 613, 623, 408 S.E.2d 365, 375 (1991) (citing J. Goldstein, A. Freud & J. Solnit, *Beyond the Best Interests of the Child* 32–33 (1973)).

[18] *Id.* (citing B. L. White, *The First Three Years of Life*, preface (1985)).

[19] At oral argument, counsel for Respondent DHHR represented that M.D. was wary of offering to care for the Twins before paternity was established, conclusively, because her son, E.N., had previously claimed to be the father of another of R.E.'s children, when, in fact, he was not. While we do not doubt counsel's veracity, we do not find support for this representation in this case's Appendix Record.

13

reported to Starling in May 2016—when the Twins were approximately one month old—that he was "most likely" their father. Despite their son's belief that he was the Twins' father, the Grandparents waited until at least August 2016 (when the Twins were approximately four months old) to make any DHHR employee aware of their interest in the Twins, and until March 2017 (when the Twins were approximately eleven months old) to attend a hearing in the Twins' court case. For example, the Grandparents did not appear at the November or December 2016 hearings where the circuit court considered, and ultimately terminated, E.N. and R.E.'s parental rights, even though it was confirmed in September 2016 that E.N. was the Twins' biological father.

This "wait and see" approach contrasts starkly with the actions of C.G. and K.G., who accepted responsibility for the Twins at their births and obtained intervenor status in the Twins' abuse and neglect proceeding in November 2016. Had the Grandparents wanted to build a relationship with the Twins before April 26, 2017, they could have done the same and sought visitation. In *Napoleon S.*, this Court explained that it would not fault the petitioning grandparents for failing to develop a relationship with their minor grandson because they had intervened in his abuse and neglect proceeding to secure visitation.[20] Here, the Grandparents never took that first step, and so they are not entitled to the same credit.

---

[20] *Napoleon S.*, 217 W. Va. at 262, 617 S.E.2d at 809.

14

At first blush, this case presents a near perfect balance between the Grandparents (an approved foster home, guardianship of the Twins' half-sister) and the foster parents, C.G. and K.G. (an approved foster home, adoption of the Twins' half-brother). And, were that the only record evidence, then we likely could have found little fault with the circuit court's application of the grandparent preference. However, viewed in its entirety, the record in this case establishes that the placement options presented to the circuit court were not evenly balanced. The undisputed and glaring facts about the presence of the biological parents in and around the home in which the Twins were to be placed, not to mention the steadfast opposition of the guardian ad litem, cannot be overlooked in the analysis of the best interest of the Twins, which must control. Because those interests are best served by permanent placement with C.G. and K.G., not their Grandparents, the Twins must be placed permanently with their foster parents.

We are mindful that this is yet another disruption in the Twins' young lives. However, we simply cannot overlook the physical proximity of the Twins' biological parents to the Grandparents' home—even after the circuit court placed the Twins there, and with no direction to DHHR on this point. As explained above, DHHR's solution, an oral warning to the Grandparents to keep E.N. and R.E. away from the Twins, can hardly suffice when E.N. and R.E. live only two doors down the street from the Twins, in a house owned by the Grandparents. We also recognize that the foster care system faces an excess of children in need of care and a shortage of suitable placements, and we do not mean either DHHR or circuit courts to disregard grandparents as a preferred placement option. The

15

current systemic overload, however, cannot justify abandoning "the polar star by which decisions must be made which affect children"[21]—their best interests.

Upon remand, the Circuit Court of McDowell County shall promptly convene parties and counsel and conduct a hearing on the most effective means of gradually transitioning the Twins from their Grandparents to C.G. and K.G.[22] The transition of these children should be accomplished in a gradual manner that most effectively serves the best interests of the children.[23]

---

[21] *In re Hunter H.*, 231 W. Va. at 123–24, 744 S.E.2d at 233 (citing *Michael K.T. v. Tina L.T.,* 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989)).

[22] *See* Syl. Pt. 8, in part, *In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996).

[23] *See Kristopher O.*, 227 W. Va. at 194, 706 S.E.2d at 391 ("[I]t has been long understood that the law governing child custody directs that a child's best interests are served by a gradual transition to a new home."); Syl. Pt. 3, in part, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991) ("It is a traumatic experience for children to undergo sudden and dramatic changes . . . . Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.").

The circuit court may also consider setting a visitation schedule for the Grandparents and the Twins' half-sister during this hearing, although those visits may not occur unsupervised at the Grandparents' home.[24]

## IV. CONCLUSION

The circuit court's May 1, 2017 order placing custody of K.E. and K.E. with their Grandparents is hereby reversed and this case is remanded for entry of an order gradually transitioning K.E. and K.E. from their Grandparents to their foster parents, C.G. and K.G. The Clerk is directed to issue the mandate contemporaneously herewith.

Reversed and Remanded with Directions.

---

[24] We also caution that "the Grandparent Visitation Act automatically vacates a grandparent visitation order after a child is adopted by a non-relative." Syl. Pt. 3, in part, *In re Hunter H.*, 231 W. Va. at 118, 744 S.E.2d at 228.

17