**STATE OF WEST VIRGINIA**

**SUPREME COURT OF APPEALS**

**FILED**

**February 7, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* K.C.

**No. 18-0242** (Raleigh County 16-JA-117)

**MEMORANDUM DECISION**

The petitioners, S.C. and E.C. (hereinafter "grandparents"), by counsel Daniel J. Burns, appeal the February 5, 2018, order of the Circuit Court of Raleigh County placing their grandchild, K.C., with the respondents, K.G. and J.G. (hereinafter "foster parents"), for adoption in this abuse and neglect case.[1]  The foster parents, by counsel Jennifer Dempsey Meeteer, filed a response asking this Court to affirm the circuit court's decision. The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Brandolyn N. Felton-Ernest, and the guardian ad litem, Stanley I. Selden, also filed responses in support of the circuit court's order.  In this appeal, the grandparents argue that the circuit court erred by failing to apply the statutory preferences for grandparent adoption and keeping siblings together.  They also contend that the circuit court erred by relying upon the opinion of the guardian ad litem with regard to K.C.'s permanent placement.

Upon consideration of the parties' briefs, oral arguments, the record on appeal, and the pertinent authorities, this Court finds no substantial question of law and no prejudicial error.  For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials to identify the parties. *See, e.g., State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990); *see also* W.Va. R. App. P. 40(e).  In this case, some of the parties share the same initials.  In particular, the child's mother and maternal grandfather are both identified as S.C.  To avoid confusion, we will refer to these parties simply as mother and grandfather.  In addition, K.C., the child who is the subject of this appeal, has an older brother with the same initials.  When discussing K.C.'s older brother with the same initials, we will refer to him as the "older K.C."

1

## I. Facts and Procedural History

K.C. is the third child of S.C., his mother, and M.W., his father. When he was born in August 2016, K.C. tested positive for drugs.[2] At that time, K.C.'s parents were already subject to an abuse and neglect proceeding, which had begun soon after the birth of their first child, B.W. in 2012.[3] The initial abuse and neglect petition, which was filed on October 12, 2012, alleged that the mother was abusing drugs intravenously and her drug use prevented her from being able to care for her child. The petition further alleged that the father was also abusing drugs and his parental rights to another child from a previous relationship had been terminated because of severe domestic violence. Upon the filing of the petition, B.W. was removed from the parental home and placed with his maternal grandparents, the petitioners herein. Thereafter, the parents stipulated to the allegations in the petition and were granted post-adjudicatory improvement periods. In January 2014, the father's parental rights to B.W. were involuntarily terminated because he failed to comply with the terms of his improvement period. The mother was afforded an additional improvement period which continued through the birth of her second child, the older K.C.,[4] in June 2014. Upon the birth of the second child, the abuse and neglect petition was amended to include him; the father was also made a party to the proceeding again.

In August 2014, the circuit court was informed that the grandparents, who then had physical custody of both children, were allowing the father to visit B.W. even though his parental rights had been terminated. The circuit court also learned that the grandparents had allowed the mother to reside in their home throughout the entire case, even when she was abusing drugs. Consequently, the children were removed from the home of the grandparents but were soon returned after a multi-disciplinary team meeting, during which the grandparents agreed to a "safety plan" whereby they would contact Child Protective Services ("CPS") and have the mother leave the home if she appeared to be under the influence of drugs or was allowing the children to have contact with their father. The case continued with both mother and father agreeing to seek substance abuse treatment.

In August 2015, the mother was arrested for trespassing, shoplifting, and possession of a controlled substance. A couple of months later, she attempted to falsify a drug screen. Subsequently, the mother entered substance abuse treatment again. The mother's improvement period continued, as did the improvement period of the father, who had also entered another drug addiction treatment program.

---

[2]The record indicates that K.C. had also been exposed to Hepatitis C.

[3]B.W. was born in January 2012.

[4]*See* note 1, *supra*.

At the time of K.C.'s birth in August 2016, the home study of the grandparents had not yet been completed. According to the DHHR, K.C. was placed with the respondent foster parents because the grandmother told a CPS worker that she could not care for all three children without their mother's help and that she did not believe her daughter would change her behavior if she took custody of the baby. There was also concern on the part of DHHR that the maternal grandmother's disabled brother, who also lived in her home, was a convicted felon.[5] A third amended abuse and neglect petition was filed by the DHHR to include K.C. in the proceeding. K.C. remained in the hospital for three weeks after his birth to wean him from the drugs in his system. Upon being designated as his foster parents, K.G. and J.G. immediately began to visit K.C. in the hospital and help feed him.

On March 24, 2017, a disposition hearing was held with respect to both parents. At that time, both parents voluntarily relinquished their parental rights to the children. The court ruled that the mother could have post-termination visitation with the children at the discretion of the adoptive parents. The court was informed that the grandparents were now seeking custody of K.C. in addition to the other two older children. At the same time, the foster parents were also seeking to adopt K.C. Consequently, the grandparents and foster parents were granted intervenor status. On October 23, 2017, the court held the first evidentiary hearing concerning K.C.'s permanent placement and heard testimony from several caseworkers who had been involved in the proceeding.[6]

At the first permanency hearing, Traci Hairston, the original CPS worker assigned to the case, testified that she was involved with the parties through May 2017, when she left her employment. She stated that shortly after K.C. was born, the grandmother told her that she was unable to take custody of him because it would be too difficult for her to care for another child. According to Ms. Hairston, the grandmother further stated that she thought her daughter, the children's mother, "might improve" if K.C. was separated from the family and placed in foster care. Ms. Hairston also testified that the grandparents had yet to pass a home study when K.C. was born, and DHHR was, therefore, uncomfortable with placing a third child in their care. Ms. Hairston further stated that it was only when it became apparent that the mother was not going to succeed in regaining custody of her children, that the grandmother began sending her text messages to let her know that she and her husband were also seeking to adopt K.C. Ms. Hairston opined that while there was a bond between all three children, K.C.'s bond with his foster parents was stronger. Ms.

---

[5]Because he lived in the grandparents' home, the DHHR was required to do a background check on the grandmother's brother as part of the home study. It was ultimately determined that he had been arrested once but was never convicted of any offense.

[6]The parties agree that the two older children were properly placed with the grandparents for adoption. Therefore, the permanency plan with respect to B.W. and the older K.C. is not at issue in this appeal.

Hairston stated that the DHHR's plan was to allow the grandparents to adopt the two older children, which they had essentially raised from birth, and to allow the foster parents to adopt K.C.

Kelly Cook Stevens, who provided contract services for DHHR, testified that she was involved with the mother's parenting and visitation. She stated that the grandmother told her before K.C was born that she did not want custody of him and desired to have him placed in a foster home, explaining that she was tired from taking care of the other two children and her disabled brother. According to Ms. Stevens, the grandmother also said that she did not believe the children's mother would ever change if she took custody of the baby. However, Ms. Stevens later received text messages from the grandmother indicating that she desired custody of K.C. Another CPS worker provided similar testimony.

During the permanency hearings, the circuit court also heard considerable evidence regarding the home studies of the grandparents. Debbie Totten, a home finding service supervisor, explained the reasons for the failed home studies, which included the grandparents' failure to provide character references; failure to undergo physical examinations to show that they were in good health and able to care for the children; failure to undergo the required training for foster and adoptive parents; failure to provide proof of pet vaccinations; failure to remove clutter from the home; failure to purchase an additional toddler bed or crib; failure to provide vehicle registrations; and failure to provide sufficient fingerprints for background checks on other adults living in the home. There was also concern about whether there were enough bedrooms in the home should K.C. be placed with his grandparents. However, another home finding specialist, Garrett Lester, testified at a subsequent hearing that there was room in the grandparents' bedroom for K.C. to sleep. He explained that DHHR policy permits a child to sleep in a room with adults until the child is two and a half years old.

The court also heard testimony from Leah Williams, the adoption worker for the foster parents. She testified that the foster parents' home study was completed in October 2014, at which time they were approved as a certified foster home. She described the foster parents as "proactive parents" going beyond what is asked of them. She noted that their house is always clean, and there have never been any concerns about their foster placements. She further testified that the foster parents have two older boys they previously adopted, and they consider K.C. to be their brother. Ms. Williams stated that there is a strong bond between K.C. and his foster family.

During the placement hearing held in December 2017, the maternal grandmother testified. She admitted that she purposely did not pass the home study by withholding information and not completing the requirements. She did this to delay the process in an effort to allow her daughter, the children's mother, to have more time to complete drug rehabilitation and be in a position to have the children returned to her. Both foster parents testified at the subsequent hearing. They explained that K.C. required a lot of care initially

4

because he was born addicted to drugs and was not eating or gaining weight. The foster father testified that he is a home health nurse and that his experience helped him in taking care of K.C. He further testified that K.C. suffers from emotional anxiety and is very attached to his wife, who is a stay at home mom. The foster parents stated that K.C. calls them "mom" and "dad," and they believe it would be difficult for him to leave their care because he has separation anxiety. The foster parents indicated they had no difficulty in allowing K.C. to visit his maternal grandparents' home to spend time with his brothers.

At the final permanency hearing on January 8, 2018, the guardian ad litem gave an oral report to the court regarding his visits to both prospective placement homes. With respect to K.C., the guardian ad litem stated that he believed it would be detrimental to K.C.'s emotional and mental health to be removed from the foster parents' custody because he has lived with them his entire life and has strongly bonded with them. Accordingly, the guardian ad litem recommended that the foster parents be permitted to adopt K.C. and that the older two children be adopted by the grandparents.

Thereafter, the court entered its final order placing K.C. with the foster parents for adoption. The court concluded in its February 5, 2018, order that

> [t]he grandparent preference provided by law is hereby overcome where the record here, reviewed in its entirety, establishes that such placement is not in the best interests of the child, [K.C.]. Intervenors [grandparents] have failed to pass three home studies. They have purposely attempted to manipulate the process by skewing matters in favor of their daughter. The court is fearful that the [grandparents] will allow their daughter, [S.C.], back in the home to help take care of the infant, [K.C.], out of necessity, placing the child at high risk of harm. The court must act to ensure this child's safety. There are too many dependents in the [grandparents'] household, straining the caregiving limits of [grandmother]. [K.C.] is a special needs child, who was born drug-addicted. Intervenors [foster parents] are particularly well-suited to care for this child. A strong bond has developed between [K.C.] and the [foster parents], whom he calls "mom" and "dad." While [K.C.] would likely develop a bond with his grandparents over time, he would have to suffer the traumatic experience of being taken away from the only home he has known in order to be in a position to do so. The [foster parents] are quite familiar with [K.C.'s] needs, and are in a position to address them if the child suffers from "drug baby" issues in adolescence. Furthermore, there is evidence that [K.C.] has bonded with two other children in the [foster parent] home, who treat [K.C.] like a

little brother. In sum, based upon the entirety of the evidence, the court determines that Intervenors [grandparents] have simply not been straightforward in their actions and have not taken the required steps to be deemed to be proper adoptive parents of [K.C.].

Following entry of this order, the grandparents filed this appeal.

## II. Standard of Review

Our standard of review for abuse and neglect cases is well established. In syllabus point one of *In the Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), this Court held:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

With this standard in mind, we consider the parties' arguments.

## III. Discussion

The grandparents first contend that the circuit court erred by not granting them custody of K.C. pursuant to the statutory preference for grandparent adoption. West Virginia Code § 49-4-114(a)(3) (2015) provides:

> For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the

6

department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

The grandparents assert that the circuit court erroneously concluded that they did not want K.C. in their home. The grandmother maintains that she initially spoke to Ms. Hairston about K.C. living with his mother at a drug rehabilitation facility, and that she told her that if that was not an option, she wanted custody of K.C. Likewise, the grandfather contends that he always told Ms. Hairston that he wanted K.C. in his home. To support their argument, the grandparents point to the fact that another home study was ordered four months after K.C.'s birth.[7] With regard to the suitability of their residence and the failed home studies, the grandparents note that the problems were never sufficient to cause the older children to be removed from their home. They argue that the circuit court erroneously concluded that their home is "too crowded" for the placement of another child. To support this argument, they point to Mr. Lester's report and testimony that their home is sufficient. They also emphasize that evidence was provided that the grandmother's brother does not have a criminal conviction, and that they finally passed the home study whereby they were certified as a kinship placement for the older children without objection by any party to this matter.[8] Finally, with regard to their ability to care for K.C., the grandparents state that they are clearly able to do so as they testified at the placement hearing that they are both involved in the care of the children and that the grandmother's brother only requires some help during the day. As for K.C.'s special needs, the grandparents note that the foster parents testified that he is no longer showing any signs of drug withdrawal and does not require specialized medical care.

In response, the foster parents argue that the circuit court properly applied the grandparent preference and determined that it is in K.C's best interests to be placed with them. They note that the grandparent preference statute requires both suitability and willingness of the grandparents as well as a favorable home study. They assert that the grandparents were unable to satisfy this criteria with respect to K.C., pointing to the testimony of the DHHR employees regarding the grandmother's statements both before and after K.C.'s birth indicating she did not want custody of him. They submit that the only evidence that the grandparents requested custody of K.C. prior to January 2017 is the

---

[7]As noted above, the grandparents had yet to pass a home study at the time of K.C.'s birth even though the two older children had been placed with them.

[8]The home study was completed after the circuit court entered its February 5, 2018, placement order.

grandparents' self-serving statements. The foster parents further argue that the grandparents are not a suitable placement for K.C. because they have indicated that they would like the mother, whose rights have been terminated, to live in the home to help take care of the children. Moreover, the grandmother has admitted that she would experience difficulty in taking care of K.C. in addition to the other members of her family residing in the home, who include her disabled brother confined to a wheel chair, her husband with a disabling back condition and other health issues, her eighteen-year-old grandson, and K.C.'s siblings, now six and four years old. Finally, the foster parents point to the failed home studies and the purposeful actions of the grandparents in that regard as evidence supporting the circuit court's decision.

With respect to the statutory grandparent preference provision, this Court held in syllabus points four and five, respectively, of *Napoleon S. v. Walker*, 217 W.Va. 254, 617 S.E.2d 801 (2005), as follows:

> West Virginia Code § 49-3-1(a) [now West Virginia Code § 49-4-114(a)] provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child.

> By specifying in West Virginia Code § 49–3–1(a)(3) [now West Virginia Code § 49-4-114(a)(3)] that the home study must show that the grandparents "would be suitable adoptive parents," the Legislature has implicitly included the requirement for an analysis by the Department of Health and Human Resources and circuit courts of the best interests of the child, given all circumstances of the case.

This Court observed in *In re Elizabeth F.*, 225 W.Va. 780, 786, 696 S.E2d 296, 302 (2010), that

> [o]ur prior holdings in *Napoleon* are critically important insofar as we explicitly recognized that a crucial component of the grandparent preference is that the adoptive placement of

8

the subject child with his/her grandparents must serve the child's best interests. Absent such a finding, adoptive placement with the child's grandparents is not proper.

In other words, "[t]he preference is just that—a preference. It is not absolute . . . the child's best interests remain paramount[.]" *In re K.E. & K.E.*, 240 W.Va. 220, 225, 809 S.E.2d 531, 536 (2018). Simply stated, "[t]he grandparent preference must be considered in conjunction with our long standing jurisprudence that 'the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children.'" *In re Hunter H.*, 227 W.Va. 699, 703, 715 S.E.2d 397, 401 (2011) (quoting Syl. Pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996)).

In accordance with the foregoing, and following multiple placement hearings during which several witnesses provided extensive testimony, the circuit court made an explicit finding in this case that adoptive placement with the grandparents would not serve K.C.'s best interests. The circuit court's decision was based upon multiple factors including the grandparents' efforts to manipulate matters in favor of their daughter by purposefully not completing the home study requirements for more than five years and the grandmother's initial refusal to take custody of K.C. out of genuine concern that she would not be able to adequately care for another child and as an attempt to force her daughter to seek treatment for her drug addiction. The court also considered the numerous people living in the grandparents' home whom depend on care from the grandmother and the strong possibility that the mother would be allowed by the grandparents to move back into the home to help care for K.C., putting his safety at risk. Critically, the circuit court considered the strong bond that has developed between K.C. and his foster parents, who are the only parents he has ever known, and K.C.'s special needs, which the foster parents have the ability to address. The circuit court clearly considered the statutory preference for grandparent adoption but found compelling evidence that it is in K.C.'s best interests to be adopted by his foster parents. Because the evidence in the record supports the circuit court's decision, we find no error.

The grandparents also argue that the circuit court erred by failing to place K.C. with them for adoption in accordance with the statutory preference for keeping siblings together. They contend that the circuit court determined that sibling separation was proper without providing any reasoning whatsoever. This Court has held:

W.Va. Code § 49-2-14(e) [now W.Va. Code § 49-4-111(e) (2015)][9] provides for a "sibling preference" wherein the

---

[9]West Virginia Code § 49-4-111(e) provides, in pertinent part:

(1) When a child is in a foster care arrangement and is residing separately from a sibling or siblings who are in

9

West Virginia Department of Health and Human Resources is to place a child who is in the department's custody with the foster or adoptive parent(s) of the child's sibling or siblings, where the foster or adoptive parents seek the care and custody of the child, and the department determines (1) the fitness of the persons seeking to enter into a foster care or adoption arrangement which would unite or reunite the siblings, *and* (2) placement of the child with his or her siblings is in the best interests of the children. In any proceeding brought by the department to maintain separation of siblings, such separation may be ordered only if the circuit court determines that clear and convincing evidence supports the department's determination. Upon review by the circuit court of the department's determination to unite a child with his or her siblings, such determination shall be disregarded only where the circuit court finds, by clear and convincing evidence, that the persons with whom the department seeks to place the child

---

another foster home or who have been adopted by another family and the parents with whom the placed or adopted sibling or siblings reside have made application to the department to establish an intent to adopt or to enter into a foster care arrangement regarding a child so that the child may be united or reunited with a sibling or siblings, the department shall, upon a determination of the fitness of the persons and household seeking to enter into a foster care arrangement or seek an adoption which would unite or reunite siblings, and if termination and new placement are in the best interests of the children, terminate the foster care arrangement and place the child in the household with the sibling or siblings.

(2) If the department is of the opinion based upon available evidence that residing in the same home would have a harmful physical, mental or psychological effect on one or more of the sibling children or if the child has a physical or mental disability which the existing foster home can better accommodate, or if the department can document that the reunification of the siblings would not be in the best interest of one or all of the children, the department may petition the circuit court for an order allowing the separation of the siblings to continue.

are unfit or that placement of the child with his or her siblings is not in the best interests of one or all of the children.

Syl. Pt. 4, *In re Carol B.*, 209 W.Va. 658, 550 S.E.2d 636 (2001) (footnote added).

Contrary to the grandparents' assertions, the circuit court clearly considered the statutory preference for keeping siblings together, but found, for the reasons discussed above, that it is in K.C.'s best interests to reside with his foster parents, separate from his brothers. The circuit court did not ignore the bond between K.C. and his brothers as it ordered visitation between them to continue to preserve their right to continued association. *See* Syl. Pt. 11, in part, *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996) ("A child has a right to continued association with individuals with whom he has formed a close emotional bond . . . provided that a determination is made that such continued contact is in the best interests of the child."). Accordingly, we find no error.

Finally, the grandparents argue that the circuit court erred by relying upon the guardian ad litem's recommendation with respect to K.C.'s permanent placement. According to the grandparents, the guardian ad litem had little contact with them and only visited their home on one occasion. They assert that "the record clearly demonstrates a total lack of meaningful interaction between the Guardian ad Litem and subject children to afford the Guardian ad Litem an[y] real opportunity to determine what the best interests of any child in the case truly is." Upon review, the record shows that the guardian ad litem was present at and participated in all of the evidentiary hearings regarding K.C.'s permanent placement. In addition, he submitted an eight-page report to the circuit court detailing his visits to the homes of the grandparents and foster parents. We find no support in the record for the grandparents' claim that the guardian ad litem failed to fulfill his duties, nor do we find that the circuit court abused its discretion by permanently placing K.C. with his foster parents in accordance with the guardian ad litem's recommendation.

Accordingly, for the reasons forth above, the final order of the Circuit Court of Raleigh County entered on February 5, 2018, is affirmed.

Affirmed.

**ISSUED:** February 7, 2019

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison

11