**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **B.B. and R.B.**

**No. 21-0240** (Harrison County 18-JA-133-3 and 18-JA-134-3)

**MEMORANDUM DECISION**

Petitioner Grandmother V.H., by counsel Michael Tyler Mason, appeals the Circuit Court of Harrison County's February 16, 2021, order denying her permanent placement of twins B.B. and R.B.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Mindy M. Parsley, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Jenna Robey, filed a response on behalf of the children also in support of the circuit court's order. The Intervening Foster Parents K.W. and M.W., by counsel Linda Hausman, filed a response in support of the circuit court's order and a supplemental appendix. On appeal, petitioner argues that the circuit court erred in permanently placing the children with the unrelated foster family rather than with her, the biological grandmother who also previously adopted the children's half-sibling.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In November of 2018, the DHHR filed a child abuse and neglect petition alleging that the parents had been arrested on drug-related charges arising in the State of Louisiana. The DHHR further alleged that the parents had exposed the children to unsafe living conditions and had failed to adequately supervise the children. The DHHR concluded that there were no relative caregivers in West Virginia to take care of the then-eight-month-old twin children. Petitioner and her other daughter, H.N., came to West Virginia seeking joint custody of the children. However, the DHHR explained that the children could not be placed in petitioner's home in Louisiana without a home

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

study pursuant to the Interstate Compact on the Placement of Children ("ICPC"). Petitioner told the Child Protective Services ("CPS") worker that the mother had been working with a federal agent against the father and had done nothing wrong. However, petitioner stated that the mother was a "drug addict."

Thereafter, the court granted the mother a preadjudictory improvement period, and by April of 2019, the DHHR placed the children with the mother to attempt to reunify the family while retaining legal custody. However, in mid-May of 2019, the mother absconded to her sister's house in Louisiana with the children. On May 17, 2019, the mother was arrested. Petitioner visited with the children while waiting for CPS workers to retrieve them. On May 21, 2019, the children were returned to West Virginia and placed with foster parents, K.W. and M.W. Thereafter, the parents filed motions for post-adjudicatory improvement periods.

In early September of 2019, the DHHR received a report by authorities in Louisiana indicating that petitioner passed a home study. However, the evaluator indicated that she believed that petitioner was not forthright regarding the state of her health and had concerns that petitioner did not provide medical records about her diagnosis and treatment for multiple sclerosis. Additionally, petitioner's other daughter, C.J., was a reference and stated that she had concerns with petitioner's ability to care for the children due to health issues. Petitioner filed a motion to intervene and motion for placement of the children in January of 2020. The father filed a response in opposition stating that he did not want petitioner to have placement of the children. The next month, the foster parents, M.W. and K.W., filed a motion to intervene.

The circuit court held a dispositional hearing in June of 2020. The court denied the parents' motions for post-adjudicatory improvement periods and terminated their parental rights. The circuit court also granted intervenor status to both petitioner and the foster parents. The mother appealed the termination of her parental rights, and this Court affirmed the circuit court's dispositional order by memorandum decision. *See In re B.B.*, No. 20-0837, 2021 WL 1550476 (W. Va. Apr. 20, 2021)(memorandum decision). In the following months, the court held permanency review hearings and determined that the children's permanency plan was adoption. However, both petitioner and the intervening foster parents sought adoption of the children.

During this time, petitioner's home was destroyed by Hurricane Laura in August of 2020, and she sought a six-month continuance to allow her time to obtain housing. The court denied the continuance and held a final permanency hearing in October of 2020. The DHHR presented the testimony of several workers, the first of which stated that she contacted several relatives, including petitioner and her other daughter H.N., when the children were initially removed. The worker stated that H.N. and petitioner lived together in Louisiana and both travelled to West Virginia to jointly request placement of the children. She stated that she explained that the children could not be placed in their home without the completion of a ICPC home study. On cross-examination, she stated that petitioner told the worker and her supervisor that the mother had been working with a Federal Bureau of Investigations agent and had done nothing wrong to warrant her arrest. She also stated that petitioner told her that the mother was addicted to drugs.

Next, a CPS supervisor testified that in early March of 2019, the mother came to the DHHR's office and told the supervisor that she believed petitioner was sabotaging her progress

and did not want the children placed with petitioner. The supervisor stated that on March 15, 2019, petitioner called her and stated she no longer sought placement of the children and to cancel the home study. However, petitioner called her back on May 22, 2019, denied the prior conversation, and requested another home study. In response, the supervisor submitted paperwork for an ICPC home study on June 7, 2019. Another ongoing CPS worker testified that petitioner first requested visitation in February of 2020 and that petitioner exercised two in-person visits before COVID-19 pandemic protocols prevented in-person visits. The only other in-person contact petitioner had with the children was in May of 2019 when the mother absconded to Louisiana. The worker stated that petitioner began exercising video visits in June of 2020. The worker testified that petitioner lost her home in a hurricane and still had no housing at that time, so another home study would need to be completed once petitioner was in her new home. The worker recommended permanent placement with the foster family because of the lack of a bond between petitioner and the twins that she witnessed during the two in-person visits. She also had concerns that petitioner would allow continued contact between the mother and the twins when the court ordered no post-termination contact. The worker highlighted that during petitioner's second visit with the children, she wanted to call the mother while the mother was incarcerated to allow her to speak with the twins despite the fact that the visit was meant for her. When discussing the children's biological half-sibling, K.N., in Louisiana, the worker agreed that the children had not known K.N. as a sibling.

In support of her motion for permanent placement, petitioner testified that she was expecting delivery of her new manufactured home soon, but that the septic and plumbing systems needed repaired. Petitioner stated that she saw her doctor every six months for her multiple sclerosis but denied that her condition negatively affected her. She testified that she had previously adopted the children's half-sibling, K.N., shortly after she was born drug-affected in prior CPS proceedings in Louisiana. Petitioner stated that K.N. referred to her as "Nana" and to the mother as her mother or the mother's first name. She stated that she allowed contact between K.N. and the mother because she was allowed to do so under Louisiana law and presented the testimony of the attorney in K.N.'s adoption proceeding, who confirmed that there were no restrictions regarding contact with K.N. and the mother. Petitioner stated that she did not have a close relationship with the mother due to her alcohol and drug abuse but conceded that she went to West Virginia during petitioner's improvement period to pay for hotels and other essentials for the family and at other times had numerous jail calls with her. She admitted that during some calls she had arguments with the mother, she referred to the mother as "mommy" with K.N. present, and that the mother indicated that the "plan" was for petitioner to allow her to see the children. Petitioner also stated that at the initiation of the case, she did not live with H.N. and that she told CPS workers that the mother was a drug dealer, which is contrary to allegations contained in the petition and the testimony of the CPS worker.

Petitioner explained that she had seen the twins once before they were taken to West Virginia and had sought placement of them since the initiation of the proceedings. According to petitioner, she only stopped seeking placement while the mother had the children during an improvement period. Petitioner testified that she would keep the twins away from the biological parents. On cross-examination, petitioner stated that her other daughter, H.N., was an unfit parent and that petitioner recently turned away placement of H.N.'s oldest child during a CPS case in Louisiana so that she could obtain the twins. She also first testified that she had not spoken to the

mother on the day that she absconded but later admitted that the mother called her and told her she planned to take the children to Louisiana. Petitioner stated that she did not call the DHHR and report this information.

The foster parents presented evidence that the children were very bonded with them and were significantly developmentally delayed when placed in their care. The children needed extensive medical treatment and vaccines. For instance, initially neither child could walk, and they received weekly occupational, vision, speech, and developmental therapy sessions. R.B. also had a double ear infection and had visual delays. K.W. and M.W. testified that the children came to them malnourished and would eat to the point of vomiting. Neither child was familiar with eating solid foods or drinking out of a sip cup. They stated that the children referred to them as "mommy" and "daddy" and referred to the foster parents' other children as "brothers." Lastly, a social worker testified that she monitored twelve video calls between petitioner and the children and did not witness a bond between them.

After hearing testimony, the circuit court denied petitioner permanent placement of the children, finding that it was in the children's best interest to remain with the foster parents, with whom they were very bonded. The court noted the lack of a bond between petitioner and the children, citing that petitioner had seen the children in-person once prior to their removal and only three times during the pendency of the proceedings—one time being when the mother absconded to Louisiana. The court stated that the children should not be "forced to form new bonds with parent figures, sibling figures, doctors, and providers." Although the court found that petitioner did not violate any court order in Louisiana regarding continued contact between K.N. and the mother, the court had concerns that the mother would be given contact with the children if placed in petitioner's care and noted that petitioner raised K.N. as a granddaughter and not as her child. The court also found that it was not in the children's best interest to be "uprooted once again," stating that "[a]t the tender age of two, these children have been removed from their parents' care, removed from their foster placement, and removed from their mother's care a second time." Lastly, the circuit court noted that the children were at a "disadvantage due to extensive medical problems and developmental delays, and that those issues had been addressed by a team of doctors, therapists, and other specialists here in West Virginia." Petitioner appeals the circuit court's February 16, 2021, order denying her permanent placement of the children.[2]

The Court has previously established the following standard of review in cases such as this:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However,

---

[2]The parents' parental rights were terminated below. The children were placed in a foster home, and the permanency plan for the children is adoption by the foster family.

4

a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in denying her motion for permanent placement of the children despite her continued requests for placement since the inception of the case. Petitioner contends that her home is appropriate, she has the financial means to take care of the children, and she has experience raising other children in foster care in Louisiana. For these reasons, she claims that the children's best interests are served by being adopted by their biological grandmother. According to petitioner, the main reason that the circuit court denied her motion was a lack of a bond, which she argues was created by the DHHR and the court's mismanagement of its "docket for such an unreasonable amount of time" that the children bonded with the foster parents, M.W. and K.W. Petitioner states that "the children spent so long bouncing around between these placements because of incompetence and procrastination that was outside of [petitioner's] control" and cites that the circuit court's delays were in violation of Rule 32 and Rule 5 of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings.

West Virginia Code § 49-4-114(a)(3), the grandparent preference statute, provides as follows:

> For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

In discussing the grandparent preference, this Court has noted that "[t]he preference is just that— a preference. It is not absolute . . . the child's best interest remains paramount." *In re K.E.,* 240 W. Va. 220, 225, 809 S.E.2d 531, 536 (2018). Simply stated, "[t]he grandparent preference must be considered in conjunction with our long standing jurisprudence that 'the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children.'" *In re Hunter H.*, 227 W. Va. 699, 703, 715 S.E.2d 397, 401 (2011) (quoting Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996)). "The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child." Syl. Pt. 2, in part, *In re K.E.*, 240 W. Va. 220, 809 S.E.2d 531 (2018) (citation omitted).

Although we have held that a circuit court erred by not adhering to the grandparent preference where "bureaucratic delays caused the child to remain in the home of the foster family for an extended period of time," *In re J.P.,* 243 W. Va. 394, 396, 844 S.E.2d 165, 167 (2020), bureaucratic delays were not to blame here. Rather, petitioner's ICPC home study was timely completed, and the children were placed in the foster home only after the mother absconded to Louisiana. The children remained in the foster home during the pendency of the parents' post-adjudicatory improvement periods.[3] Notably, petitioner supported the mother's efforts during her improvement period to reunify with the children, and petitioner withdrew her request for placement during that time. Only after the mother failed to complete the terms of her improvement period did petitioner request a home study—a request with which the DHHR complied. Accordingly, petitioner's argument that the court's delays somehow prejudiced her are without merit as the DHHR completed the ICPC home study as soon as practicable and completed the requirements pursuant to the grandparent preference.

Having reviewed the record in its entirety, we agree with the circuit court's finding that permanent placement with petitioner was not in the children's best interest. By the time of the final placement review hearing, the children had been placed with M.W. and K.W. for seventeen months and the children were two years and seven months old. Therefore, these young children had spent half of their lives with M.W. and K.W. and had bonded to them as parents. Petitioner concedes this fact and the record wholly supports it.

> This Court has previously stressed the importance of the "continuity of relationships, surroundings and environmental influence" during a child's first three years of life. These early years are truly formative because, "[i]n their simple everyday activities, infants and toddlers form the foundations of *all* later development." Thus, the Twins' best interests require that the bonds they formed with [the foster parents] in . . . seventeen months of [their] life not be short-changed.

*In re K.E.*, 240 W. Va. 220, 227, 809 S.E.2d 531, 538 (2018). Additionally, the court made special note of the twins' severe developmental delays and medical needs, which were being addressed by doctors and other specialists here, and it considered that the twins refer to K.W. and M.W.'s other children as "brothers" and to K.W. and M.W. as "mommy" and "daddy." The strong bonds and substantial progress made while in the care of the intervening foster parents cannot be overlooked as petitioner suggests the Court should do.

Beyond the above evidence, the record shows other concerns with petitioner as permanent placement, including issues that bear on her veracity and judgment. For instance, testimony showed that petitioner knew—but failed to report—that the mother had taken the children and intended to flee to Louisiana, and petitioner was not initially truthful when asked whether she spoke to the mother when the mother absconded. Additionally, petitioner testified that she told the CPS workers that the mother was a "drug dealer" when the petition and the CPS worker's

[3]According to the guardian, issues arose regarding the mother's competency in her criminal case, which necessitated a determination by the court in these proceedings as to whether a guardian ad litem should be appointed for the mother; therefore, any continuances regarding the outcome of the mother's competency were justified.

testimony showed that petitioner denied that the mother had done anything wrong when the children were removed. Furthermore, petitioner testified that her other daughter H.N. was a "drug addict," yet she and H.N. together went to West Virginia to initially obtain custody of the twins.

It is also worthwhile to note that although petitioner presented evidence that in Louisiana she had the discretion to allow contact between the mother and K.N., the circuit court expressed concern with petitioner's judgment to allow this relationship and the emotional distress it caused K.N. The court noted that K.N. referred to petitioner as Nana and to the terminated mother as her mother, indicating that despite adopting K.N., petitioner raised her as a granddaughter and continued to allow the child to be exposed to the emotional trauma of the mother's repeated drug abuse, incarcerations, and general failure to stay involved in her life. Finally, the mother indicated in jail phone calls with petitioner that she expected to see the twins if they were placed with petitioner, and petitioner referred to the mother as "mommy" in K.N.'s presence. Petitioner testified that she would not allow contact with the mother if the court prohibited it, but the circuit court found her testimony incredible considering petitioner's close relationship with the mother and the fact that petitioner already had adopted a sibling that she had raised as a grandchild. This is a credibility determination we decline to disturb on appeal. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations.").

As such, it was not in the children's best interest to be removed from the home in which they had lived half of their short lives and placed in a home where they had no bond with the relatives, including petitioner. Therefore, we find no error in the circuit court's determination that placement of the children in the foster family's home was in their best interests given the lack of a bond with petitioner as well as the children's strong bond with the foster family, the concerning family dynamics of petitioner with H.N. and the mother, the length of time the children had lived in K.W. and M.W.'s home, and their substantial progress made while in their care.

For the foregoing reasons, we find no error in the decision of the circuit court, and its February 16, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: February 1, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton