**FILED**
**November 18, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**In re A.H.**

**Nos. 21-0053, 21-0055, and 21-0056** (Fayette County 18-JA-91)

**MEMORANDUM DECISION**

In the fall of 2018, the Department of Health and Human Resources (DHHR) filed a petition alleging that an eleven-month-old infant, A.H.[1] (the child) had been abused and neglected by her biological parents. The child was placed with foster parents C.L. and B.L., with whom she still lives, and the parental rights of the biological parents were terminated in January 2020. The court permitted ten individuals—eight family members and C.L. and B.L.—to intervene and be considered as a permanent placement for the child. After conducting a series of lengthy hearings where the intervenors testified and were cross-examined, the circuit court entered a 28-page order in which it found that a permanency plan of adoption by foster parents C.L. and B.L. served the child's best interest. The child's paternal grandparents,[2] paternal aunt and uncle,[3] and maternal grandfather,[4] all intervenors below, now appeal from that order (Petitioner-Intervenors). Respondents DHHR,[5] the guardian ad litem,[6] and B.L. and C.L.[7] filed briefs in response. The child's maternal aunt and uncle[8] and maternal grandmother,[9] intervenors, below, did not.

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials to identify the parties. *See, e.g.*, *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Petitioner-Intervenors M.H. and T.H., paternal grandparents, are represented by Jamison T. Conrad, Esq.

[3] Petitioner-Intervenors T.M. and D.M., paternal aunt and uncle, are represented by Anthony M. Salvatore, Esq.

[4] Petitioner-Intervenor D.J., maternal grandfather, is represented by Brandon L. Gray, Esq.; Matthew A. Bradford, Esq.; and Kyle G. Lusk, Esq.

[5] Respondent Department of Health and Human Resources is represented by Lindsay S. See, Esq., Solicitor General, and Brandolyn N. Felton-Ernest, Esq., Assistant Attorney General.

[6] The guardian ad litem is Vickie L. Hylton, Esq.

[7] Respondent-Intervenors B.L. and C.L. are represented by Todd A. Kirby, Esq.

[8] Respondent-Intervenors J.J. and K.J. are represented by Juston H. Moore, Esq.

[9] Respondent-Intervenor M.H.-1 is represented by Evan Dove, Esq.

1

We do not see that the circuit court's order is an abuse of its discretion. The court carefully considered the record, including Petitioner-Intervenors' testimony, to make factual findings and credibility determinations culminating in the permanency determination. The circuit court appropriately considered the statutory preference afforded to grandparents in the determination of permanency and gave due consideration to the child's paternal aunt and uncle and foster parents B.L. and C.L. For those reasons, we affirm the circuit court's order.

Upon consideration of the standard of review, the briefs, the record presented, and oral argument, the Court finds a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

## I. Facts and Procedural History

We present the factual and procedural history of the child's case in three parts: petition to disposition (September 2018 to January 2020), permanency (January 2020 to December 2020), and the circuit court's order (December 2020). We set forth additional facts pertinent to the individual Petitioner-Intervenors' appeals in the analysis of their assignments of error.

### A.    Petition to Disposition

The child was born to mother L.J. and father H.H. in January 2018. The child was born drug-dependent, but the DHHR did not file a petition alleging abuse and neglect in view of the extant "safety plan." L.J. had complied with that plan—participating in medically assisted therapy (MAT) for her substance abuse disorder and living with the child's paternal grandparents, M.H. and T.H., in Fayette County—before the child was born, and she continued to do so after the birth.

In the late spring and summer of 2018, L.J. moved with the child back and forth between her own families' homes in Wayne County and the paternal grandparents' home in Fayette County. Two things happened in August 2018: (1) H.H., the child's father, was released from incarceration in Monongalia County to confinement in his parents' home in Fayette County, and (2) L.J. began using drugs, again. In response, the DHHR approved the child to stay in the paternal grandparents' home with H.H. and limited L.J.'s visitation with the child. Then, on August 31, 2018, H.H. overdosed on heroin in his parents' basement. L.J. was present. H.H.'s parents, M.H. and T.H., were in the house, and the child was in the home, asleep. H.H. survived the overdose.

The DHHR filed a petition on September 25, 2018, alleging that L.J. and H.H. had abused and neglected the child through their substance abuse. They later stipulated to the allegations of abuse and neglect at the November 2018 adjudicatory hearing and were adjudicated. The court ordered the child removed from the home of the paternal grandparents, M.H. and T.H., and placed with foster parents. L.J. and H.H. pursued drug treatment in December 2018. They were not successful, however, and were arrested in Virginia in January 2019 on felony drug charges.

When the matter came on for a dispositional hearing on January 31, 2019, the court continued the case to permit L.J. and H.H. to submit motions for post-adjudicatory improvement periods. Meanwhile, the child remained with foster parents, B.L. and C.L. Per an assessment by WV Birth to Three, the child demonstrated a twenty-five percent developmental delay; nonetheless, she was doing well with the foster parents and their children. The court permitted the

2

paternal grandparents supervised visitation with the child. The court denied L.J. and H.H.'s motion for post-adjudicatory improvement periods in March 2019 and maintained the child's placement with B.L. and C.L. The court continued visitation between the child and the paternal grandparents and granted the DHHR and the guardian ad litem discretion to facilitate visitation between the child and other biological family members.

In June 2019, the DHHR moved to amend the abuse and neglect petition to add allegations of domestic violence and to reopen the final adjudicatory hearing. The court granted the motion. There the matter lay until November, when the Department informed the court that it could not substantiate the new allegations and that it wished to proceed on the original grounds for adjudication. The court held a dispositional hearing on January 29, 2020, during which H.H. relinquished his parental rights to the child and L.J.'s parental rights were involuntarily terminated. L.J. did not appeal the termination of her parental rights. The child remained in her placement with B.L. and C.L.

## B.      Disposition to Permanency

On January 10, 2020, the court permitted the child's paternal grandparents (M.H. and T.H.), paternal aunt and uncle (T.M. and D.M.), maternal aunt and uncle (K.J. and J.J.), maternal grandmother (M.H.-1), and foster parents (B.L. and C.L.) to intervene in the case and seek to become the child's permanent placement. On the same date, the court suspended visitation between the child and the non-foster parent intervenors, in anticipation of the dispositional hearing and permanency proceedings. Later in January, the court also permitted the child's maternal grandfather, D.J., to intervene.

To inform the court's permanency determination, the guardian ad litem and the DHHR interviewed the intervenors, all represented by counsel, over two days in March 2020. In her report submitted later that month, the guardian ad litem recommended that permanent placement with the foster parents was in the child's best interest and that permanent placement with the other intervenors was not. The court then conducted a series of evidentiary hearings at which the intervenors and others testified and were subject to cross-examination. On December 21, 2020, the circuit court entered an order in which it found that a permanency plan of adoption by foster parents B.L. and C.L. was in the child's best interests and that permanent placement with the other intervenors was not.

## C.      The Permanency Order

After reviewing the procedural history of the case and the pertinent law, the court considered the permanency cases of each intervenor, beginning with M.H. and T.H., the child's paternal grandparents.

The court acknowledged that M.H. and T.H. had served as L.J.'s "safety resource" before the petition was filed in September 2018, and that the child lived with them in the weeks after the petition was filed. But, the court found, continued placement in the home, pre-disposition, was not appropriate because H.H. had been ordered to serve home confinement there. And, the event precipitating the filing of the petition—a drug overdose—occurred in M.H. and T.H.'s home; it had been alleged that M.H. and T.H. had enabled H.H. to visit the child after the petition had been

3

filed; and T.H. had brought the child to a court hearing, despite being instructed not to do so. The court acknowledged that M.H. and T.H. had visited the child, supervised, from January 2019 to January 2020.

Based on the evidence and testimony presented, the court found that T.H. had not accepted H.H.'s responsibility for his own drug abuse. Similarly, the court found that M.H. never accepted the need for H.H. to participate in inpatient rehabilitation in West Virginia, despite H.H.'s lengthy history of substance abuse and prior failed attempts at rehabilitation. Moreover, the circuit court found, M.H. and T.H. had not been truthful about their contact with H.H. or his whereabouts. Viewing all the evidence and the testimony, the court found that M.H. and T.H. were not prepared to place the needs of the child above those of H.H. The court expressed particular concern over future contact between the child and H.H., stating that "[a]lthough continued contact with [H.H.] is clearly not in the best interest of the minor child, this [c]ourt has little doubt that situational contact, and potentially even facilitated contact, will occur should the child be permanently placed" with M.H. and T.H. After stating that neither the DHHR nor the guardian supported permanent placement with M.H. and T.H., the court then found permanent placement with M.H. and T.H. not to be in the overall best interest of the child.

The circuit court next considered D.J., the maternal grandfather. The court found that he had "at best, a tenuous relationship" with the child, who had never lived with him or had contact with him beyond that incidental to contact with L.J. The court found that D.J. lived in the same home as J.J. and K.J., the child's maternal aunt and uncle. J.J. and K.J. had attempted to intervene early in the abuse and neglect proceeding. D.J., the court observed, hadn't sought permanent placement in his own right until much later. The court viewed this timing with suspicion, and opined that D.J. was leveraging the grandparent preference to obtain custody of the child so that she could be raised by J.J. and K.J. The court recalled that pre-disposition, L.J. (the biological mother) had indicated a willingness to grant K.J. guardianship of the child while she sought treatment. Taken together, these conditions left the court with the distinct impression that D.J., K.J., and J.J. acted with the ulterior motive of bringing the child back together with L.J. Emphasizing the child's tender age and her need for consistency and continuity of care, the court found that placement with D.J. was not in the child's best interests. Neither the DHHR nor the guardian ad litem recommended permanent placement with D.J.

The court also considered T.M. and D.M., the child's paternal aunt and uncle who live in South Carolina, for permanent placement. The court found that they did not have a significant relationship with the child before the petition was filed. The court found that aunt T.M. sought custody of the child only after she was prompted by her mother T.H. The court found that T.M.'s recollection of the circumstances underlying allegations of child abuse against M.H. was inconsistent. The court also found that T.M. was "clearly averse to [L.J.'s] family and [had] previously indicated that if she was not selected as the permanent placement of the minor child, the [c]ourt should select any stranger off the street, but certainly not any of [L.J.'s] family." Neither the DHHR nor the guardian ad litem recommended placement with T.M. and D.M. The court found permanent placement with T.M. and D.M. not to be in the child's best interests.

Finally, the court considered the foster parents B.L. and C.L. for permanent placement. The court found that the child had lived with them and their three daughters since November 15, 2018. The child had developed a "strong parental connection and attachment to" B.L. and C.L.,

whom she views as her "'Mommy' and 'Daddy'" "as well as a strong sibling unity with [their] three young daughters." The court found that B.L. and C.L. had "consistently fostered and facilitated contact with the minor child's biological family and made every effort to secure familial continuity for the minor child by opening up their home, lives, and family to the minor child's biological family," and that they had shown "heartfelt affection and a sincere concern for the development and wellbeing" of the child. The court went on:

> This [c]ourt joins the GAL and Department in their belief that the separation anxiety and intolerance to change displayed and experienced by [the child] is so severe that placement with the other intervenors with whom the minor child has no significant relationship would cause her to regress to the point she may not be able to retain the developmental progress she has made while in the care of [B.L. and C.L.].

> Moreover, based upon the level and length of care provided by [B.L. and C.L.], the attachment and bond [the child] has developed with [B.L. and C.L.] and their daughters during the last two years, and the tender age of the minor child, forcing the child to integrate into the home setting of one of the other intervenors would likely require considerable time and be detrimental to the minor child's overall advancement, health, stability and wellbeing.

> . . . .

> Unlike the paternal grandparents, maternal grandparents, and other intervenors, the [c]ourt finds no ulterior motive behind [B.L. and C.L.'s] desire to secure permanent placement of the child in their home.

> If the minor child is permanently placed with [B.L. and C.L.], the [c]ourt has little doubt that [they] will ensure that the minor child's safety and wellbeing are maintained, and only appropriate and proper familial contact occurs.

> . . .

> There is little doubt that the biological intervenors independently have affection for the minor child and their home[s are] suitable for placement of a young child.

> That affection, however, is clouded by what [the court] perceives as underlying, ulterior motives for the permanent placement of the minor child.

> The only fit and proper motive to seek the placement of the minor child is the sincere desire to ensure the health, development,

5

safety and wellbeing of a very young child that has needlessly and wrongfully been subjected to abusive and neglectful circumstances.

The court then ordered that the permanency plan for the child is to be adoption by foster parents B.L. and C.L. and directed the DHHR to make every reasonable effort to achieve the permanency plan.

## II. Standard of Review

Our standard of review is well-settled:

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[10]

In brief, "'[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*' Syl. Pt. 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996)."[11]

## III. Analysis

Five Petitioner-Intervenors appeal the December 21, 2020, permanency order: T.M. and D.M. (paternal aunt and uncle), M.H. and T.H. (paternal grandparents), and D.J. (maternal grandfather). We consider Petitioner-Intervenors' arguments regarding the permanency decision in that order, then turn to their challenge to the court's prohibition on visitation with the child.

### A. T.M. and D.M., Paternal Aunt and Uncle

T.M. and D.M. assign three errors to the circuit court's decision that it was not in the child's best interests to grant them permanent placement of the child. First, they argue that the circuit

---

[10] Syl. Pt. 1, *In Int. of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

[11] Syl. Pt. 1, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

court erred when it did not account for The Foster and Kinship Parent Bill of Rights, West Virginia Code § 49-2-127(14), (15), and (16). Second, they contend that the circuit court's permanency decision contravenes the child's rights under The Foster Child Bill of Rights, West Virginia Code § 49-2-126(a)(1), (2), (5), and (6) (as amended, eff. June 5, 2020[12]). Finally, they argue that the circuit court erred when it found that it was not in the child's best interests to be placed, permanently, with them. None of these assigned errors merits reversal of the permanency order.

T.M. and D.M.'s argument under The Foster and Kinship Parent Bill of Rights fails for a fundamental reason: they were never the child's foster or kinship parents. As defined in West Virginia Code § 49-1-206, a "foster parent" is "a person with whom the department has placed a child and who has been certified by the department, a child placing agency, or another agent of the department to provide foster care."[13] Section 49-1-206 defines "kinship parent" as "a person with whom the department has placed a child to provide a kinship placement."[14] The Department never placed the child with T.M. and D.M.; therefore, they are neither "foster parents" nor "kinship parents" and so do not have standing to invoke The Foster and Kinship Parent Bill of Rights.

Turning to T.M. and D.M.'s argument regarding The Foster Child Bill of Rights, that statute provides in pertinent part that:

> (a) Foster children and children in a kinship placement are active and participating members of the child welfare system and have the following rights:
>
> (1) The right to live in a safe and healthy environment, and the least restrictive environment as possible;
>
> (2) The right to be free from physical, sexual, or psychological abuse or exploitation including being free from unwarranted physical restraint and isolation;
>
> . . .

---

[12] The Foster Child Bill of Rights was enacted in 2015. The Legislature rewrote the statute in 2020 and added the provisions now relied on by T.M. and D.M. *See* 40 W. Va. Acts 2020.

[13] W. Va. Code § 49-1-206 (2020). We apply the version of the statute in effect at the time of the circuit court's order. The Legislature amended § 49-1-206 in 2021, adding a definition of the term, "restorative justice program." *See* 53 W. Va. Acts 2021. The definitions discussed here were not altered by the 2021 amendments. *Compare* W. Va. Code § 49-1-206 (2020) *with* 53 W. Va. Acts 2021.

[14] W. Va. Code § 49-1-206. The statute defines "kinship placement" as "the placement of the child with a relative of the child, as defined herein, or a placement of a child with a fictive kin, as defined herein."

7

(5) The right to be placed in a kinship placement, when such placement meets the objectives set forth in this article;

(6) The right, when placed with a foster [or] kinship family, to be matched as closely as possible with a family meeting the child's needs including, when possible, the ability to remain with siblings.

T.M. and D.M. argue that the "circuit court did not examine the facts of this case under The Foster Child Bill of Rights Act," and had it done so, it would have placed the child in their home, where she could be "free of restrictions such as not seeing her other family members;" "free from isolation from her family members;" "in a kinship placement with the appellants or her paternal grandparents;" and "with kin [] meeting her daily needs [] and with biological cousins who serve the closest to a sibling bond as any children in this case."

As to alleged restrictions upon the child's ability to see her family members and isolation from biological family members, the circuit court made adverse findings regarding T.M. and D.M.'s willingness to permit the child contact with her extended, biological family. The court found that T.M. "was clearly averse to [L.J.'s] family and previously indicated that if she was not selected as the permanent placement of the minor child, the [c]ourt should select any stranger off the street, but certainly not any of [L.J.'s] family." While T.M. did testify that she would permit the child to visit with L.J.'s side of the child's family, that stated intention does not erase the fact that T.M. and D.M. live in South Carolina—so, while the child would have the ability to see T.M. and D.M., she would live hours away from the rest of her extended family.

Moreover, T.M. and D.M. appear to argue that they must be the child's permanent placement because they are the child's blood relatives, that is, placement in their household (or M.H. and T.H.'s) is necessary to preserve the child's right to live free "of restrictions such as not seeing her family members" and "isolation from her family members." But that argument cannot be accepted, because it would bar a foster family from *ever* being considered for permanency because the placement would restrict the foster child's ability to see her biological family.[15] The portion of The Foster Child Bill of Rights relied upon by T.M. and D.M. bestows upon the foster child "[t]he right to be placed in a kinship placement, when such placement *meets the objectives set forth in this article*," which includes protection of the child's best interests.[16] For those reasons,

---

[15] *Cf.* W. Va. Code § 49-2-127(14) (foster parent has "[t]he right to be considered, where appropriate and consistent with the best interests of the child, as a permanent parent . . . for a child who is available for adoption or legal guardianship").

[16] *See* W. Va. Code §§ 49-2-126(a)(11) (2020) (stating that the foster child has a right to maintain contact with prior caregivers and other important adults in his or her life, unless prohibited by court order or determined by parent not to be in child's best interest); 49-2-128(a) (2020) (defining "reasonable and prudent foster parent standard" as "the standard characterized parental decisions that maintain the child's health, safety, and *best interests*, while at the same time encouraging the child's emotional and developmental growth, that a caregiver shall use when determining whether to allow a child to participate in extracurricular, enrichment, and social

T.M. and D.M.'s argument—that the circuit court *necessarily* violated § 49-2-126(a)(1), (2), (5), and (6) by granting permanency to B.L. and C.L., foster parents—fails.[17]

Finally, we take up T.M. and D.M.'s contention that the circuit court erred when it found that permanency with them was not in the child's best interests. T.M. takes issue with the court's finding that she had not formed a bond with the child before the abuse and neglect proceeding was instituted, arguing that the foster family had not bonded with the child before that point, either. But that point is irrelevant. There is no dispute that the first time T.M. saw the child was after the institution of this abuse and neglect proceeding, so we see nothing clearly wrong in the circuit court's factual conclusion that T.M. had not formed a bond with the child before the petition was filed.

T.M. next argues that, while the circuit court acknowledged that she exercised visitation with the child before January 2020, it did not assign any weight to the finding, so that the court's best interest finding is clearly wrong. We disagree. T.M. testified that she visited the child eight times between March 2019 and January 2020.[18] Considering that M.H. and T.H. visited much more frequently, and that the child was in B.L. and C.L.'s home, we do not see that the simple fact of T.M.'s visitation could tip the scales in her favor. T.M. and D.M. also argue that theirs is an approved foster home by the State of South Carolina. T.M. and D.M. admit that the circuit court acknowledged this in the permanency order, but they do not explain how the finding, standing alone, establishes the circuit court's order as an abuse of discretion.

Finally, T.M. and D.M. assert that the circuit court simply "threw in with the DHHR and the Guardian Ad Litem and concluded [they] were just not in the overall best interests of the minor child." Again, we disagree. The circuit court's order contains eleven specific findings regarding T.M. and D.M., including credibility determinations to which we give substantial deference. T.M.

---

activities") (emphasis added); 49-2-801(1) (2015) (providing that "[i]t is the purpose of this article through the complete reporting of child abuse and neglect: (1) To protect the *best interests* of the child") (emphasis added); 49-2-127a (2020) (proving that a foster or kinship parent agreement "may contain such other terms and provisions, not inconsistent with this article, as may be negotiated by the parties and as may be in the *best interests* of the child") (emphasis added); 49-2-127(14) (2020) (foster parent has right to consider for permanent placement of foster child "where appropriate and consistent with the *best interests* of the child") (emphasis added); 49-2-802(d) (2018) (directing that "[i]n those cases in which the local child protective services office determines that the *best interests* of the child require court action, the local child protective services office shall initiate the appropriate legal proceeding") (emphasis added).

[17] For purposes of this decision, we assume T.M., D.M., M.H., and T.H. have standing to challenge a court order on the grounds that it violates a right granted to the child under § 49-2-126. We do not decide the standing question as T.M., D.M., M.H., and T.H.'s arguments under the statute fail on other grounds. D.J. does not make an argument under The Foster Child Bill of Rights.

[18] T.M. testified that these visits lasted for approximately two hours, each. She also testified that during those visits she was in the company of at least eight other people.

9

and D.M. have not pointed to anything in those findings that is *clearly wrong*.  Consequently, they offer no compelling reason to disturb the circuit court's order.

## B.    M.H. and T.H., Paternal Grandparents

M.H. and T.H. assert that the circuit court failed to properly consider the child's rights under The Foster Child Bill of Rights during these abuse and neglect proceedings.  They argue that the circuit court misapplied the statutory grandparent preference.[19]  Finally, they argue that the circuit court erroneously ceased their visitation with the child in January 2020.

We first consider M.H. and T.H.'s argument regarding The Foster Child Bill of Rights.[20] Their primary argument appears to be that the circuit court erred by not placing the child with them during the abuse and neglect proceeding, writ large.  That is, they do not confine their argument regarding the child's right to be placed with them, her kin, to permanency.[21]  We reject this broad approach.  The applicable version of The Foster Child Bill of Rights did not take effect until June 5, 2020.[22]  The majority of episodes M.H. and T.H. complain of occurred *before* June 5, 2020.  For example, M.H. and T.H. argue that the child's right to a kinship placement, set forth in § 49-2-126(a)(5), was violated when the court ordered the child removed from their home at the November

---

[19] W. Va. Va. Code § 49-4-114(a)(3) (2015).

[20] M.H. and T.H. do not make an argument under The Foster and Kinship Parent Bill of Rights.  W. Va. Code § 49-2-127.  Again, we assume but do not decide that M.H., and T.H.  have standing to challenge a court order on the grounds that it violates a right granted to the child under § 49-2-126.

[21] Nor do M.H. and T.H. confine their argument to placement in *their* home.  In their brief, they complain that the child "was never placed in another kinship placement after the removal" and that the circuit court "erred in finding that the best interests of the child were promoted by the permanent placement with foster parents when there were five intervening family members, including [M.H. and T.H.], who were an approved placement of DHHR."  We understand M.H. and T.H. to appeal the denial of permanency to *them*, not the child's biological family, generally. We cabin our analysis, accordingly.

[22] M.H. and T.H. also rely on W. Va. Code § 49-4-601a, providing that "[w]hen a child is removed from his or her home, placement preference is to be given to relatives or fictive kin of the child."  That statute also took effect on June 5, 2020, which is after many of the actions of the circuit court they challenge in this assignment of error.  They also reference W. Va. Code § 49-4-405(c) (2015), which requires that a multi-disciplinary team (MDT) consider appropriate relatives before foster homes for out-of-home placements.  However, based on our review of the record, the court and MDT considered multiple relative placements for the child, including her maternal grandfather's home.

10

2018 adjudicatory hearing. Again, that occurred *before* June 5, 2020, the effective date of the applicable version of The Foster Child Bill of Rights. Thus, the statute cannot apply.[23]

The question becomes then whether the circuit court violated the child's right under § 49-2-126(a)(5) in December 2020, when it granted permanency to the foster parents, rather than T.H. and M.H.,[24] her grandparents. Because M.H. and T.H. are the child's grandparents, the circuit court's permanency order also implicates the grandparent preference statute, West Virginia Code § 49-4-114(a)(3) (2015), and the requisite best interest analysis.[25] We have held that

> West Virginia Code § [49-4-114(a)(3) (2015)] provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child.[26]

The circuit court found that, although M.H. and T.H. are now an approved kinship placement, permanent placement with them was not in the child's best interests based on twenty-

---

[23] Practically, M.H. and T.H. were not eligible at that time to be the child's placement because there were substantiated allegations of child abuse against M.H. M.H. filed an administrative appeal of those substantiated findings, and they were ultimately reversed in June 2020. However, those substantiated findings were extant from the commencement of the abuse and neglect petition until June 2020, rendering M.H. and T.H. an unsuitable placement for the child during that period. We agree with the circuit court that the child "should not have initially been placed with the paternal grandparents." Regardless, any error on the part of the Department in doing so does not negate the fact that those substantiated allegations existed and were a disqualifying condition.

[24] As stated, *supra*, the plain language of § 49-2-126(a)(5) demonstrates that the kinship placement right conferred upon the foster child by that provision is not absolute. Instead, the right attaches "when such placement *meets the objectives set forth in this article*," which include protection of the child's best interests.

[25] *See* Syl. Pt. 5, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005) ("By specifying in West Virginia Code § 49–3–1(a)(3) that the home study must show that the grandparents 'would be suitable adoptive parents,' the Legislature has implicitly included the requirement for an analysis by the Department of Health and Human Resources and circuit courts of the *best interests of the child*, given all circumstances of the case.") (emphasis added).

[26] Syl. Pt. 4, *id.*

11

three separate factual findings. Upon careful review of the briefs and record, we conclude that M.H. and T.H. have not established that the circuit court's account of the evidence is implausible, when the record is viewed in its entirety, and therefore, clearly wrong.

Many errors alleged by M.H. and T.H. relate to credibility determinations; for example, they argue that paragraphs 62, 63, 64, and 65 of the permanency order are clearly erroneous because "a review of the transcript doesn't give the same *impression* of the facts as these findings." Similarly, M.H. and T.H. contest the findings in paragraph 66 of the circuit court's order. There, the circuit court found that "[t]hroughout these proceedings and despite numerous failed rehab attempts, [M.H.] was averse to, and refused to seek, in-state, in-patient drug rehabilitation for his son, [H.H.], contrary to the requirements and recommendations of the MDT members." M.H. and T.H. contest this finding on the ground that "it is not supported by the evidence at the hearing or the MDT report. *M.H. directly disputed these allegations during his testimony*."[27] Simply put, M.H. disagrees with the circuit court's assessment of the evidence and the credibility of various witnesses. But that does not establish that a finding is clearly erroneous, nor does it necessarily undermine the court's credibility determination.[28]

M.H. and T.H. also have not shown the circuit court's finding in paragraph 57 to be clearly erroneous. There, the circuit court found that the decision to remove the child from the home of M.H. and T.H. was based, in part, on H.H.'s presence in their home, under home confinement, attendant to a ten-year sentence for a conviction for first-degree robbery. M.H. and T.H. do not dispute that H.H. was subject to home confinement, nor do they point to anything in the record to indicate that H.H. has discharged the sentence, that it has been modified by the Circuit Court of Monongalia County, or that it has been revoked. Instead, they rely on the testimony of Child Protective Services worker Katharine Jenkins from the July 6, 2020, permanency hearing, to the effect that H.H. had not lived in the home of M.H. and T.H. since shortly after the petition was filed in September 2018.[29] We have reviewed this portion of Ms. Jenkins' testimony and do not

---

[27] *Emphasis added*. M.H. and T.H. do not provide a date of "the hearing" or specify which of the numerous MDT reports they rely on.

[28] *Kanawha Cnty. Bd. of Educ. v. Sloan*, 219 W. Va. 213, 222, 632 S.E.2d 899, 908 (2006) (Benjamin, J., concurring in part and stating that "[a] fact-finder . . . has the advantage of a three dimensional view of facts, including not just the black and white of what was said, but also witness demeanor and tone").

[29] When questioned as to whether H.H. was under court order to live with M.H. and T.H. at the time of oral argument, counsel responded that he had never seen such an order. Later, counsel acknowledged that there was an order that required H.H. to reside with M.H. and T.H., but that H.H. had not lived with them since shortly after the petition was filed and M.H. and T.H. had had only minimal contacts with their son.

Counsel's representations to this Court regarding his knowledge of H.H.'s home confinement are difficult to square with the following representations he made to the circuit court during the August 2020 permanency hearing: that (1) H.H. had been convicted of robbery in the first-degree by the Circuit Court of Monongalia County; (2) H.H. was sentenced to one to ten years

find it pertinent to the question of whether H.H. is under a legal obligation to reside with M.H. and T.H.; instead, it addresses whether he has chosen to abide by it. Moreover, when questioned on this point during that August 19, 2020, hearing, T.H. simply responded that the Division of Corrections and Rehabilitation was supposed to be monitoring H.H. Lacking any indication to the contrary, and based on the record before this Court, we cannot say that H.H. is no longer obligated to reside in the same home in which M.H. and T.H. seek to raise the child; such a living situation cannot serve her best interests.[30]

Finally, we consider M.H. and T.H.'s challenge to what is the circuit court's penultimate finding: that, "[a]lthough continued contact with [H.H.] is clearly not in the best interest of the minor child, this [c]ourt has little doubt that situational contact, and potentially even facilitated contact, will occur should the child be permanently placed with the paternal grandparents." M.H. and T.H. argue that the evidence before the circuit court "is that H.H. hasn't resided with M.H. and T.H. since September 2018, and any contact with H.H. has been very minimal." H.H. and M.H go on to label the court's finding "completely speculative and not supported by the transcript of the proceeding."

We disagree. The circuit court heard testimony that even after H.H.'s parental rights were terminated, and while they pursued permanent placement of the child, M.H. and T.H. were in continued contact with H.H. It heard testimony from M.H. that he had not warned his other children of the threat H.H. might pose to their children, i.e., M.H.'s other grandchildren, because "[t]hey know the situation. It's up to them to make the decision whether they think it is safe." T.H. testified that H.H. does not present a danger to children. Specifically, she testified that:

> [H.H.]'s not a danger, but I mean I wouldn't – just because of the drug – what we've learned about addiction I wouldn't leave him – I don't think he's going to hurt [T.M.]'s children, but I wouldn't have left him with them just because once you're an addict you have issues and that's how addicts – that's what happens – go to counseling for addicts and you'll know that.

_____

of confinement; (3) H.H.'s sentence of confinement was suspended and he was placed in the Anthony Center for six months to two years; (4) H.H.'s probation was revoked when, in January 2017, his probation was revoked due to a positive drug screen and H.H. served thirty days in jail; (5) H.H.'s probation was revoked again in September 2017; (6) H.H. was confined for approximately another year; and (7) H.H. successfully moved the Circuit Court of Monongalia County to reconsider his sentence and place him on home confinement with M.H. and T.H.

[30] *Cf. In re K.E.*, 240 W. Va. 220, 809 S.E.2d 531 (2018) (awarding placement of the child to the foster family where concerns arose over the fact that the grandparents' children, i.e., the parents whose rights had been terminated, lived down the street in a house owned by the grandparents); *In re Elizabeth F.*, 225 W. Va. 780, 696 S.E.2d 296 (2010) (finding that best interests of the child were met by placement with the foster family due to grandparent's willingness to allow child multiple interactions with grandparent's adult children who abused drugs and whose rights to the child had been terminated).

The testimony before the circuit court also tended to show that T.H. minimized H.H.'s actions and their consequences.

M.H. and T.H. also testified that, if they were to be the child's permanent placement, they would not allow H.H. to have contact with her. But the testimony cited above provides support for the circuit court's conclusion that, despite their best intentions, situational contact between the child and H.H. would likely occur. That conclusion was also supported by the conflicting testimony of T.M., who testified that she "do[es] not allow [her] own children around [H.H.], there's no way [she] would let [the child] around him." Yet, T.M. also testified that in February 2020 (after H.H.'s parental rights to the child had been terminated), she permitted him to stay in her home, overnight because she "wasn't going to turn him away, he looked great." T.M.'s husband, D.M. indicated that he would allow H.H. access to D.M.'s home to see the child if H.H. was "in his right mind and we are permitted to do so."[31] Later, he the stated that he would not, however, *if told not to do so*. Again, D.M.'s testimony supports the circuit court's conclusion that situational contact will likely occur between H.H. and the child should she be permanently placed with T.M. and D.M.

We have considered M.H. and T.H.'s remaining challenges to the circuit court's factual findings regarding whether permanent placement in their home is in the child's best interests. That review does not leave us "with the definite and firm conviction that a mistake has been committed,"[32] that would cause us to disregard the deference due to the circuit court. For these reasons, we find that the circuit court did not abuse its discretion when it found that permanent placement with M.H. and T.H. is not in the child's overall best interests.

## C. D.J., Maternal Grandfather

Intervenor-Petitioner D.J., the child's maternal grandfather, also contends that the circuit court failed to properly apply the grandparent preference, so the order granting permanency to B.L. and C.L. is erroneous.

As with M.H. and T.H., the circuit court found that D.J.'s home (which he shares with the child's maternal aunt and uncle, K.J. and J.J., intervenors below) is a kinship placement certified by the DHHR. So, the question before the circuit court was, grandparent preference notwithstanding, whether permanent placement with D.J. was not in the child's best interests given all the circumstances of this case.

Like M.H. and T.H., D.J. challenges the circuit court's factual findings and credibility determinations. For example, D.J. asserts that the court's finding that he has, at best, a "tenuous relationship with" the child, is wrong. For support, he cites to his own testimony in which he recounts that he had babysat the child overnight, many times. When pressed, however, D.J. could not recall the number of overnights more specifically, testifying that there had been more than six

---

[31] Specifically, D.M. was posed this question, "Do you have any problem with refusing [H.H] access to your home if he showed up on your doorstep to see [the child]? He answered, "As long as he's in his right mind and we are permitted to do so."

[32] Syl. Pt. 1, in part, *In Int. of Tiffany Marie S.*, 196 W. Va. at 223, 470 S.E.2d at 177.

overnight stays but that he could not say whether there had been more or less than twelve. Regardless of the exact number, the court's finding—that these overnights, pre-petition, plus the visitation afforded after the petition was filed amounts to a tenuous relationship—is not clearly wrong.

Similarly, D.J. challenges the circuit court's finding that he declined temporary placement of the child when she was removed from M.H. and T.H.'s care and before she was placed in foster care. D.J. contends that he did not refuse placement; only that he told the DHHR that he had to talk with K.J. and J.J., first, because they all lived together. We do not see that this "context" renders the finding clearly wrong. Rather, in the context of the emergency placement of an infant, we cannot say the circuit court clearly erred by equating D.J.'s equivocation to a refusal.

In paragraph 86 of the permanency order, the court "opine[d] that [D.J.] seeks to take advantage of the statutory placement preference in hopes of increasing his chances of securing placement of [the child] in his home only to relinquish the actual care and raising of the child to [K.J. and J.J.] once placement is achieved." D.J. challenges this as simply the court's opinion and not based on the facts. We disagree that the record is devoid of support for the court's opinion; namely, that when first contacted by the DHHR about placement, D.J. deferred to K.J. and J.J. and stated that he thought they could provide all the things the child would need. The court also heard testimony that D.J. had wanted the child to be placed with K.J. and J.J. from the beginning of this case. Given this evidence, it was not clearly wrong for the circuit court to view D.J.'s intervention as a strategy to give K.J. and J.J.—the child's aunt and uncle—a "leg up."[33] West Virginia Code § 49-4-114(a)(3) grants a placement preference to grandparents, so that "placement with *grandparents* is presumptively in the best interests"[34] of the child—not her aunt and uncle.

D.J. also challenges paragraphs 90 and 92. There, the court opined that animosity between D.J. and M.H.-1, the child's maternal grandmother, played a motivating role in D.J., K.J., J.J. and M.H.-1's decisions to intervene to obtain custody of the child. D.J. argues that these opinions lack support in the record and are indicative of the circuit court's hostility to family placements and preference for continuity of care, i.e., placement with C.L. and B.L. The record is not devoid of support for the court's statements. Before termination of their parental rights, H.H. and L.J. objected to M.H.-1's participation in MDT meetings. D.J. did as, as well. According to the guardian ad litem's report, K.J. stated that M.H.-1 was not fit to be a placement for the child, and D.J. and H.H. agreed. K.J. also stated that she would not allow M.H.-1 to have visits with the child if K.J. was granted custody. While D.J. and J.J. later testified that if the child was permanently placed in their home, they would allow M.H.-1 to visit, J.J. had also stated that he would be the one to facilitate the visits—not D.J. The circuit court could have rationally inferred animosity

---

[33] This appears to be a theme of this case. T.M. and D.M. state in their brief that "[i]t was and is [their] position [that M.H. and T.H.] should have been the permanent placement for [the child]. In an effort to ensure [the child] was placed with family, [T.M. and D.M.] moved to intervene."

[34] Syl. Pt. 4, in part, *Napoleon S.*, 217 W. Va. at 254, 617 S.E.2d at 801 (emphasis added).

between D.J., K.J., J.J., and M.H.-1 from these statements that would not be conducive to stability for the child.[35]

We have recognized "that a crucial component of the grandparent preference is that the adoptive placement of the subject child with his/her grandparents must serve the child's best interests. Absent such a finding, adoptive placement with the child's grandparents is not proper."[36] While there is a presumption that placement with a grandparent is in the child's best interest, "[i]f, upon a thorough review of the entire record, the circuit court believes that a grandparental adoption is not in the subject child's best interests, it is not obligated to prefer the grandparents over another, alternative placement that does serve the child's best interests."[37] So, we must also consider the circuit court's findings regarding B.L. and C.L.

Here, the circuit court found that placement with M.H., T.H., D.J., T.M., and D.M. was not in the child's best interests. Importantly, it also found that placement with B.L. and C.L. *was*. At the time the permanency order was entered, the child had lived with B.L., C.L., and their three daughters for a little over two years, that is, two-thirds of her life. The court found that B.L. and C.L. accessed WV Birth to Three services and followed through with that service's recommendations so that the child caught up to her developmental milestones in stellar fashion. The circuit court also found that B.L. and C.L. "consistently fostered and facilitated contact with the minor child's biological family and made every effort to secure familial continuity for the child by opening their homes, lives, and family to the minor child's biological family."[38] Petitioner-Intervenors do not dispute this finding. B.L. and C.L. permitted M.H. and T.H. to visit the child weekly throughout 2019, until the circuit court ceased visitation in anticipation of disposition and the determination of permanency. B.L. and C.L. permitted other family members—including D.J. and T.M.—to visit the child, as well. Again, this is undisputed.

The circuit found that the child "has developed a strong parental connection and attachment to [B.L. and C.L.], as well as a strong sibling unity with [their] three young daughters." D.J. acknowledged this. M.H. acknowledged this. T.H. testified that B.L. and C.L. have been good caregivers to the child and T.M. testified that they have done an exceptional job. The circuit court further found that the child's "attachment to [B.L. and C.L.] is significant enough that the child displays considerable stress and anxiety when away from [B.L. and C.L.] even if only for a short time." This finding is undisputed. Moreover, C.L. testified that even after only four-and-a-half months in her care, the child "regressed" after being separated from her for only one week. Later,

---

[35] We have reviewed D.J.'s remaining challenges to the circuit court's findings. Any error therein does not leave us with the firm conviction that the circuit court committed a mistake when it found that permanent placement with D.J. was not in the child's best interest.

[36] *In re Elizabeth F.*, 225 W. Va. at 786, 696 S.E.2d at 302.

[37] *Id*. at 787, 696 S.E.2d at 303.

[38] For example, B.L. and C.L. held the child's second birthday party at their home. B.L., C.L., their daughters, C.L.'s mother, C.L.'s grandmother, B.L.'s parents, T.M., D.M., their three children, M.H., and T.H. attended.

when separated from C.L. for approximately one week, the child "exhibited more meltdowns. She asked for mommy frequently. She also asked for her siblings, the sisters as she refers to them, frequently."

We have stated that the grandparent preference "is just that—a preference. It is not absolute. As this Court has emphasized, the child's best interest remains paramount[.]"[39] "[T]he grandparent preference must be considered in conjunction with [this Court's] long-standing jurisprudence that "the primary goal in cases involving abuse and neglect must be the health and welfare of the children."[40] Here, the circuit court concluded that:

> [a]fter thorough consideration of the various grandparent and kinship placement options, the [c]ourt **FINDS** and **CONCLUDES** none of the potential placements are the most appropriate option to ensure the continued health, safety, and welfare of the minor child.
>
> . . .
>
> The [c]ourt **FINDS** and **CONCLUDES** that it is in the minor child's best interest to permanently place the minor child with intervenors, B.L. and C.L.

After carefully considering the record and the parties' arguments, and when viewed through the lens of the controlling standard of review, we do not find the circuit court's permanency order of December 21, 2020, to be an abuse of discretion.

## D. Visitation

All Petitioner-Intervenors challenge the circuit court's January 10, 2020, ruling suspending their visitation with the child. During that hearing, the court ruled that "until we determine on the 26th [sic[41]] whether or not these biological parents maintain their rights or not[,] I think that the visitation needs to cease, so that will be the order of the [c]ourt." Later, during the hearing on January 29, 2020, at which H.H. relinquished his parental rights and L.J.'s were involuntarily terminated, the court affirmed that ruling, explaining that:

> Well, at the last hearing I think I entered an order that no visitation is to occur because – and the reason I do that is not to hurt anybody's feelings or anything. I don't want one party to just camp on the doorstep of the foster parents and visit every other day, while other people don't and then you get the impression – well, they were

---

[39] *In re K.E.*, 240 W. Va. at 225, 809 S.E.2d at 536.

[40] *Id.* (cleaned up).

[41] Earlier in the hearing, the court had scheduled the dispositional hearing for January 29, 2020.

17

shown favoritism over us and whatever. So just to get around that, I don't think any of these intervenors ought to be able to visit with the child while this is ongoing, until I know just what the facts and circumstances are.

D.J. appears to argue that the circuit court's ruling violates rights his rights under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.[42] M.H. and T.H. argue that the circuit court was "hostile to a kinship placement" and so ended visitation in 2020 to "intentionally damag[e] the cases of all family members" and "ensure[] that any bond which did not exist would no longer exist that the time of the final Permanency Hearing." T.M. and D.M. argue that the circuit court "manufactured the foster family bond by virtue of its own order, and then in turn used that bond as a hammer on the blood relatives in reaching its conclusion to award permanency to the foster family over every other blood relative."[43]

As the guardian ad litem and foster parents observe, the circuit court initially suspended visitation when it anticipated that permanency questions would soon be resolved. They were not. The judicial emergency declared in response to the COVID-19 pandemic, counsels' requests for continuances, the number of intervenors and the need to afford them all the opportunity to present their cases extended the duration of the permanency proceeding. These circumstances distinguish this case from our recent decision in *In re J.P.*, in which we reversed the circuit court's placement of J.P. with foster parents for adoption, rather than a grandparent. There, our decision turned "largely . . . on the delays and shortcomings of the West Virginia DHHR and its counterpart agencies in Pennsylvania."[44] Here, the permanency proceeding was protracted for the reasons stated, above. Petitioners' assertions that the circuit court suspended visitation to sabotage their bond with the child are baseless; the court placed on the record the reasoning behind the ruling.[45] In view of the circumstances that existed at that time of the circuit court's visitation decision, we do not find its ruling to be an abuse of discretion.

We have held that "[a] child has a right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child."[46] The

---

[42] *See, e.g.*, *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 861 (1977) (Stewart, J. concurring).

[43] T.M. and D.M. argue that the circuit court's January 2020 ruling violates The Foster Child Bill of Rights. As stated above, the provisions cited by T.M. and D.M. did not take effect until June 2020, well after ruling they challenge, here.

[44] *In re J.P.*, 243 W. Va. 394, 401–02, 844 S.E.2d 165, 172–73 (2020).

[45] Moreover, our review of the record demonstrates that the focus of the court's inquiry was the various intervenors' bond with the child before the filing of the petition through disposition—not any lack of bonding resulting from the protracted permanency process.

[46] Syl. Pt. 11, *In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996), *holding modified by State ex rel. C. H. v. Faircloth*, 240 W. Va. 729, 815 S.E.2d 540 (2018).

protracted nature of this case is regrettable as is the impact it may have had on the child's bonds with the Petitioner-Intervenors. Nevertheless, "the best interests of the child is the polar star by which decisions must be made which affect children."[47]

> As we said in *In re Carlita B.,* 185 W.Va. 613, 623, 408 S.E.2d 365, 375 (1991), the early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement.[48]

The child's permanency has been left in limbo for three years. We do not see a remedy for this alleged error that would further her interest in permanency, nor have Petitioner-Intervenors offered one. For those reasons, we conclude that Petitioner-Intervenors are not entitled to relief.

### IV. Conclusion

For the reasons stated above, we affirm the December 21, 2020, order of the circuit court.

**Affirmed.**

**ISSUED:** November 18, 2021

**CONCURRED IN BY:**

Chief Justice Evan Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison

---

[47] *Kristopher O. v. Mazzone*, 227 W. Va. 184, 192, 706 S.E.2d 381, 389 (2011) (quoting *Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 405, 387 S.E.2d 866, 872 (1989)).

[48] *State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 257, 470 S.E.2d 205, 211 (1996).

**CONCURRING AND WRITING SEPARATELY:**

Justice William R. Wooton

WOOTON, J., concurring:

I concur with the majority's ruling that the circuit court did not err in permanently placing A.H. with the foster parents. The record before us provides ample support to the circuit court's findings that placement with any of the intervening biological relatives would not have been in A.H.'s best interests. I write separately to emphasize that the circuit court's decision in January 2020 to cease visitation between A.H. and the intervenors may have violated A.H.'s right to continued association with individuals to whom she is emotionally bonded.

This Court has long held that "[a] child has a right to continued association with individuals with whom he [or she] has formed a close emotional bond . . . provided that a determination is made that such continued contact is in the best interests of the child." Syl. Pt. 11, in part, *In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996). In reaching this holding, we explained that

> [t]he guiding principle relied upon by this Court in recommending consideration of continued contact with a child is whether a strong emotional bond exists between the child and an individual such that cessation in contact might be harmful to the child, both in its transitory period of adjusting to a new custodial arrangement and in its long-term emotional development.

*Id.* at 735, 482 S.E.2d at 912.

In addition to our precedent on this matter, the Legislature has codified a child's right to continued association. In adopting The Foster Child Bill of Rights, the Legislature rewrote West Virginia Code § 49-2-126 (2020) to specifically enumerate the basic rights afforded to foster children, which includes "[t]he right to maintain contact with all previous caregivers and other important adults in his or her life, if desired, unless prohibited by court order or determined by the parent . . . not to be in the best interests of the child." *Id.* at § 49-2-126(a)(11).

In the case at bar, the circuit court unceremoniously terminated visitation between A.H. and all of the intervenors, despite A.H.'s emotional bond with the paternal grandparents. In so doing, the circuit court made no findings whatsoever that this cessation was in A.H.'s best interests, and it does not appear from the record that the circuit court considered whether such cessation would be harmful to the child. Rather, the circuit court's justification for terminating all contact between the various intervenors and this child was: (1) that managing the visits would be inconvenient for the DHHR and the foster parents; and (2) the apparent fear that the intervenors would "camp out" on the foster parents' doorstep to try to gain some advantage over the other intervenors prior to the court reaching a permanency decision.

20

As a preliminary matter, nothing in the statutes or our caselaw states that "inconvenience" is a factor to be considered in determining whether to sever a child's emotional bond with prior caregivers or other important adults in his or her life. To the extent the circuit court justified the cessation of visits upon fear of inconveniencing the foster parents or the DHHR, it did so in error.

Moreover, the circuit court's concern that one set of intervenors would attempt to gain some advantage over the others is unsupported by the record. The record clearly shows that the foster parents both encouraged and facilitated contact between A.H. and all of the intervenors. They even went so far as to host family gatherings and birthday parties to which the intervenors were invited. There is nothing in the record illustrating that the foster parents, the DHHR, or the guardian had any concerns about the intervenors' conduct during these visits, nor is there evidence showing the visits were anything but beneficial to A.H. As a baseline, I believe the circuit court erred generally in terminating all visitation between A.H. and the intervenors without making findings that such cessation would not harm the child. *See Jonathan G.*, 198 W. Va. at 735, 482 S.E.2d at 912.

More specifically, the record is clear that cessation of visitation between A.H. and the paternal grandparents was unquestionably harmful to A.H. The paternal grandparents, unlike any of the other intervenors, were the child's prior caregivers. For the first ten months of her life, from birth to November 2018, A.H. lived in the paternal grandparents' home and the record suggests that they were the primary caregivers during that time. Further, even after A.H. was removed from their home, the paternal grandparents exercised at a minimum weekly visitation with A.H. until the circuit court ceased all visitation in January 2020. The record shows that the paternal grandparents attended a total of fifty-seven visits with her while she was in the foster parents' home, and nothing in the record demonstrates that those visits were anything other than successful and beneficial to A.H.. Further, the circuit court clearly found in its permanency order that the paternal grandparents "had the most extensive established relationship" with A.H. among all of her relatives.

Yet, despite this established relationship, the circuit court prohibited the paternal grandparents from having any contact with A.H. from January 2020 through the end of these proceedings, effectively severing any bond she may have had with them. The circuit court gave no explanation for this decision, other than those stated above. More to the point, the circuit court never made any findings to assess whether the cessation of contact would be harmful to A.H. or whether it would be in her best interests. This is a clear deviation from our precedent which is openly founded on the concern that severing contact in this way may be both harmful to the child and a violation of the child's right to continued association.

While one cannot know for certain whether A.H. has suffered harm as a result of the circuit court's decision, in light of the evidence before us that she was clearly bonded to the paternal grandparents, such a conclusion is reasonable. Further, it is abundantly clear that any such harm—real or theoretical—could have been prevented had the circuit court simply allowed visitation to continue with the paternal grandparents. In the absence of findings explaining why the cessation

21

of visitation was in A.H.'s best interests, it is impossible to determine whether the circuit court's action was properly justified.

Given the circuit court's multiple findings explaining that it was not in A.H.'s best interests to be permanently placed with the paternal grandparents, one might be tempted to impute those findings to the visitation context. However, upon closer examination, the analysis is not so easily transferable on these facts. The circuit court determined that placement with the paternal grandparents was not in A.H.'s best interests largely because: (1) the paternal grandparents refused to acknowledge that their son's (A.H.'s father) behavior was detrimental to the child's wellbeing; and (2) the circuit court feared the paternal grandparents might facilitate contact between A.H. and her biological father despite his parental rights having been terminated. Both are clearly proper and reasonable considerations in the context of permanency. However, neither would have been applicable in the context of supervised visitation with A.H. It is hardly likely that the paternal grandparents could have brought the biological father to a visit without the foster parents or the visitation supervisor immediately preventing his contact with the child. Moreover, the supervisor or the foster parents would have been more than capable of ending a visit or taking other corrective action with the court at the first sign the paternal grandparents tried to influence A.H.'s opinion of the biological father, either by defending his actions to her or otherwise. In short, the concerns the circuit court had regarding permanent placement are entirely allayed in the visitation context.

Ultimately, while I believe the circuit court erred generally in terminating visitation between A.H. and all of the intervenors, I agree with the majority that it was proper to permanently place A.H. in the custody of the foster parents. Despite the correctness of the placement, the circuit court could have and should have made a stronger effort to preserve A.H.'s emotional ties to her biological relatives, particularly with regard to the paternal grandparents with whom she had the strongest bond. Instead, the circuit court perfunctorily severed those emotional bonds in clear contravention of A.H.'s right to continued association.

Going forward, I would caution circuit courts to be particularly mindful of children's statutory right to continued association with prior caregivers and persons with whom the child shares an emotional bond. *See* West Virginia Code § 49-2-126(a)(11). In that regard, I would encourage circuit courts to make appropriate findings as required by our precedent regarding whether cessation of visitation is in a child's best interest or whether such cessation may, in fact, harm the child. *Jonathan G.*, 198 W. Va. at 735, 482 S.E.2d at 912. Finally, I wish to commend the foster parents for their endeavors to ensure that A.H. maintained contact with her biological relatives until the circuit court halted visitation in January 2020, and I would encourage them resume that contact after adoption to the extent they believe it would be in A.H.'s best interest to do so.

For these reasons, I respectfully concur in the majority opinion.